225 P.3d 973 (2010)
STATE of Washington, Respondent,
v.
Jacob GAMBLE, Petitioner.
State of Washington, Respondent,
v.
Rodney James Harris, Petitioner.
State of Washington, Respondent,
v.
Gantry Lomone Mathews, Petitioner.
State of Washington, Respondent,
v.
Leron Ford, Petitioner.
State of Washington, Respondent,
v.
James G. Alexander, Petitioner.
Nos. 80131-2, 80405-2, 80469-9, 80536-9, 81389-2.
Supreme Court of Washington, En Banc.
Argued June 30, 2009.
Decided January 28, 2010.
*977 Lisa Elizabeth Tabbut, Attorney at Law, Longview, WA, Thomas Michael Kummerow, Washington Appellate Project, Kathryn A. Russell Selk, Russell Selk Law Office, Eric Broman, Nielsen Broman & Koch PLLC, Seattle, WA, for Petitioner.
Michael C. Kinnie, Clark County Prosecutor's Office, Vancouver, WA, Kathleen Proctor, Pierce County Prosecuting Atty. Office, Tacoma, WA, Gregory Marshall Banks, Island County Prosecutor's Office, Coupeville, WA, Andrea Ruth Vitalich, King County Prosecutor's Office, Seattle, WA, for Respondent.
MADSEN, C.J.
¶ 1 In each of these consolidated cases the primary issue is whether the mandatory joinder rule barred the State from bringing additional homicide charges against the defendants after the defendants' original convictions for second degree felony murder was overturned as a result of this court's decision in In re Personal Restraint of Andress, 147 Wash.2d 602, 56 P.3d 981 (2002). We conclude that the mandatory joinder rule does not bar the homicide charges brought against the defendants.

FACTS
¶ 2 Each of the defendants was originally convicted of second degree felony murder with assault as the predicate felony. Subsequent to their convictions, this court held in Andress that under former RCW 9A.32.050 (1976) a conviction of second degree felony murder could not be based on assault as the predicate felony. All of the defendants challenged their second degree felony murder convictions (on appeal or through a personal restraint petition) and either the convictions were vacated in light of Andress and In re Personal Restraint of Hinton, 152 Wash.2d 853, 100 P.3d 801 (2004), or, after reversal, retrial on the felony murder charge was precluded by Andress. Each of the defendants was then tried on new charges, including second degree intentional murder, homicide by abuse, and manslaughter. In each case, the defendant contended that under the mandatory joinder rule the new charges had to have been joined with the original second degree felony murder charge. However, the State contended, and the trial courts agreed, that the "ends of justice" exception to the mandatory joinder rule applies because the decision in Andress was an extraordinary, unforeseeable event. Each defendant was again convicted and then appealed. The Court of Appeals affirmed the defendants' convictions and the trial courts' determinations that the "ends of justice" exception to the mandatory joinder rule applies.
¶ 3 Additional facts are set forth below.

ANALYSIS
¶ 4 1. Mandatory joinder rule and applicability of the "ends of justice" exception.
¶ 5 The primary issue in these cases is whether the Court of Appeals erred in upholding the trial courts' decisions that the "ends of justice" exception to the mandatory joinder rule applies. Under the mandatory joinder rule, CrR 4.3.1(b)(3), two or more offenses must be joined if they are related, subject to exceptions identified in the rule. "Related offenses" are two or more offenses within the jurisdiction and venue of the same court that are based on the same conduct. CrR 4.3.1(b)(1). "Same conduct" is conduct involving a single criminal incident or episode. State v. Watson, 146 Wash.2d 947, 957, 51 P.3d 66 (2002); State v. Lee, 132 Wash.2d 498, 503, 939 P.2d 1223 (1997). CrR 4.3.1(b)(3) states in part:
A defendant who has been tried for one offense may thereafter move to dismiss a charge for a related offense. ... The motion to dismiss must be made prior to the second trial, and shall be granted unless the court determines that because the prosecuting attorney was unaware of the *978 facts constituting the related offense, or did not have sufficient evidence to warrant trying this offense at the time of the first trial, or for some other reason, the ends of justice would be defeated if the motion were granted.
(Emphasis added.) The rule does not prohibit charging lesser offenses of the original charged offense, because lesser offenses do not have to be charged at all. State v. Anderson, 96 Wash.2d 739, 744, 638 P.2d 1205 (1982) (Anderson II); RCW 10.61.006. The mandatory joinder rule is procedural; it does not implicate double jeopardy. State v. Dallas, 126 Wash.2d 324, 330-31, 892 P.2d 1082 (1995).
¶ 6 The mandatory joinder rule is intended as a limit on the prosecutor, and its purposes are to protect defendants from (a) successive prosecutions that can act as a hedge against the risk of an unsympathetic jury at the first trial, (b) a "hold" on the defendant after the defendant has been sentenced, or (c) harassment of the defendant through multiple trials. Id. at 331-32, 892 P.2d 1082; see also Lee, 132 Wash.2d at 503, 939 P.2d 1223 (citing State v. Harris, 130 Wash.2d 35, 43-44, 921 P.2d 1052 (1996)); State v. Russell, 101 Wash.2d 349, 353 n. 1, 678 P.2d 332 (1984); State v. Ramos, 124 Wash.App. 334, 340 n. 21, 101 P.3d 872 (2004) (Ramos I); ABA Standards for Criminal Justice, Joinder and Severance 13-2.3 (2d ed. 1980 & Supp.1986). The rule "does not differentiate based upon the prosecutor's intent. Whether the prosecutor intends to harass or is simply negligent ... [the rule] applies to require a dismissal of the second prosecution." Dallas, 126 Wash.2d at 332, 892 P.2d 1082.
¶ 7 The State appropriately concedes in each of the consolidated cases that the new charges filed against the defendants are related charges within the meaning of the mandatory joinder rule. See Lee, 132 Wash.2d at 503, 939 P.2d 1223. The only question is whether the ends of justice exception applies.
¶ 8 We employ an analysis of the ends of justice exception to the mandatory joinder rule that is analogous to the analysis that is applied under CR 60(b)(11). Dallas, 126 Wash.2d at 333, 892 P.2d 1082 (citing State v. Carter, 56 Wash.App. 217, 223, 783 P.2d 589 (1989)). CR 60(b)(11) permits vacation of a judgment on the ground of "other reason[s] justifying relief," and requires extraordinary circumstances. Thus, for the ends of justice exception to mandatory joinder to apply, there must be "extraordinary circumstances." Dallas, 126 Wash.2d at 333, 892 P.2d 1082. In addition, "[t]he circumstances must involve reasons which are extraneous to the action of the court or go to the regularity of its proceedings." Id. The exception cannot be invoked in the case of a prosecutor's ordinary mistake or negligence in charging.
¶ 9 Cases decided under CR 60(b)(11) show that "extraordinary circumstances" are unusual circumstances that are not within the control of the party. For example, extraordinary circumstances were found under the civil rule when a separation agreement that gave a disparate share of property to the former husband in exchange for the wife not being required to pay child support was an unenforceable attempt to avoid child support and constituted an extraordinary circumstance permitting vacation of the agreement. In re Marriage of Hammack, 114 Wash.App. 805, 60 P.3d 663 (2003). In another case, the fact that the plaintiff's attorney suffered from severe depression was a sufficient ground under the rule to relieve the plaintiff from an order of dismissal based on the attorney's failure to comply with a discovery order, when the failure was not due to incompetence or deliberate inattentiveness, the plaintiff diligently provided the discovery information to the attorney, and the irregularities were outside the control of the plaintiff, the defendant and the court. Barr v. MacGugan, 119 Wash.App. 43, 78 P.3d 660 (2003).
¶ 10 In In re Adoption of Henderson, 97 Wash.2d 356, 644 P.2d 1178 (1982), changes made in a governing statute provided that adoption decrees should be final from the date of entry. The court held that an adoptive father's adoption decree was invalid only insofar as it had been made interlocutory. Further, under CR 60(b)(11) vacation of the decree of adoption was proper if on remand *979 the trial court determined that this would be in the best interests of the children, where the interlocutory provision had been included by mistake and the adoptive father had been misadvised about his rights.
¶ 11 In the consolidated cases now before the court, the State contends that the circumstances presented by the Andress decision are truly extraordinary and justify application of the ends of justice exception.[1] We agree.
¶ 12 The circumstances of Andress and its effect on numerous existing second degree felony murder convictions are out of the ordinary, not within the control of the State, and extraneous to the action of the court. The extraordinary nature of these circumstances is shown by the fact that in several of these cases the defendants' convictions occurred after they were charged only with second degree felony murder based on assault, an offense that, as became clear under Andress, was a nonexistent crime. See Hinton, 152 Wash.2d at 857, 100 P.3d 801. Thus, these defendants would never have any viable homicide charges brought against them, as a legal matter, for the deaths they caused if the mandatory joinder rule were to apply and bar any additional homicide charges. The decision in Andress and its impact on all second degree felony murder convictions based on assault entered over more than 25 years constitute "extraordinary circumstances" for purposes of CrR 4.3.1(b)(3).
¶ 13 In addition, Andress and its effect on second degree felony murder convictions were not within the control of the prosecutors and were extraneous to the actions of the trial courts.
¶ 14 We agree with the Court of Appeals that the ends of justice exception applies in these cases. This conclusion fully accords with the purposes of the "ends of justice" exception. The mandatory joinder rule is, as explained, a limit on the prosecution. The rule is intended to prevent the prosecution from trying the defendant again for the same conduct if the jury acquits the first time. This did not happen in these casesnone of the defendants were acquitted by a jury. The rule also prevents placing a "hold" on the defendant when incarceration on a conviction ends so he can be snared on another related charge. This did not occur in these cases, either. The rule is also intended to prevent the state from simply harassing the defendant. This also did not occur. Nor did "ordinary mistakes" or "negligence" on the part of the prosecutors cause the necessity for additional charges to be filed. Instead, in each case the prosecutor sought a conviction, the jury returned a guilty verdict, and the only reason the State successively sought to try the defendants on new charges was because the presumptively valid convictions were vacated as the result of this court's opinion in Andress.
¶ 15 The defendants, however, make several arguments why, in their view, the ends of justice exception does not apply in these cases. First, they contend that the Court of Appeals erroneously applied the analysis from Ramos I to these cases.[2] In Ramos I, the court vacated the defendants' convictions for second degree felony murder and then addressed the question whether the mandatory joinder rule barred the State from bringing charges of first degree manslaughter against the defendants on remand, as the State indicated it was going to do. The court concluded that the mandatory joinder rule did not require it to dismiss with prejudice as the defendants argued. The defendants in the present cases contend that the Court of Appeals erroneously treated Ramos I as establishing a blanket rule that the ends of justice exception applies if Andress requires vacation of a murder conviction.
¶ 16 We disagree. Indeed, the reason that the ends of justice exception applies in all of these cases is because, as in Ramos I, all of the defendants were charged with and convicted of a presumptively valid offense that was, however, a nonexistent offense. Applying the ends of justice exception where the *980 facts are the same does not involve an improper analysis of the mandatory joinder rule and application of the ends of justice exception.
¶ 17 The defendants' next argument is that prosecutors have broad discretion in charging decisions, including the authority to charge in the alternative. Thus, having made a choice about what to charge, prosecutors must be held to that decision. However, if the prosecutor was always bound by the original charging choice there would be no reason for CrR 4.3.1(b)(3) and its ends of justice exception.
¶ 18 In a related vein, in Gamble and Harris the defendants contend that the prosecutor in fact hedged against an unfavorable outcome by knowingly choosing to prevent their juries from considering manslaughter as a lesser conviction. They argue that justice is not served by permitting the State to pursue a conviction for manslaughter after their second degree felony murder convictions were vacated, given that the crime of manslaughter could have been charged from the outset and in light of the mandatory joinder rule.
¶ 19 But these two cases do not involve the kind of "hedge" with which the mandatory joinder rule is concerned, because there was no acquittal followed by the State bringing other charges. Instead, in each case the defendant was convicted of second degree felony murder and that conviction was later vacated for reasons beyond the prosecutor's control. Further, there is no requirement that the prosecutor charge all possible crimes. State v. Korum, 157 Wash.2d 614, 626 n. 3, 141 P.3d 13 (2006). Indeed, as noted above, the rule and its exceptions anticipate that the State has not done so.
¶ 20 Next we are directed to Anderson II, where the defendant's first degree murder conviction for the scalding death of his stepdaughter had been reversed on the basis that "extreme indifference" was an improper charge. The relevant statute, RCW 9A.32.030(1)(b), did not permit this charge to be brought against one whose "extreme indifference to human life" is directed toward one person, the victim. See State v. Anderson, 94 Wash.2d 176, 186-90, 616 P.2d 612 (1980) (Anderson I). The reversal "was based upon the inapplicability of the statute ... to the situation presented." Anderson II, 96 Wash.2d at 744, 638 P.2d 1205. The State then charged the defendant with first degree premeditated murder based on the same incident, and the defendant's motion to dismiss on the ground of double jeopardy was denied. The court reversed on the ground that the mandatory joinder rule barred the State from bringing the first degree premeditated murder charge. However, since lesser offenses had been presented to the jury by instructions requested by the defendant and the State, the court held the State was not barred from recharging the lesser offenses.
¶ 21 Anderson II is unlike Andress. Here, the defendants were charged with a nonexistent offense. In contrast, in Anderson II the statute at issue simply did not apply under the facts of the case.[3] That the statute did not apply when the defendant's "extreme indifference" was directed toward one person, the victim, was also true under the prior statute and the prosecutor should have realized that for this reason the statute did not apply. Anderson II involves an ordinary mistake by the prosecutor.
¶ 22 The exception to the joinder rule at issue in Anderson II was not the same as here, either. The State contended in Anderson II only that it had developed new evidence to prove the charge. This contention was rejected on the ground that the State failed to explain why the "new" evidence was not available at the time of the *981 first trial. Anderson II, 96 Wash.2d at 740-41, 638 P.2d 1205.
¶ 23 The next argument is that Andress was not an unexpected, surprising case, contrary to the State's claim and as the courts in Ramos I and the present cases concluded. Rather, the argument continues, Andress construed new language in former RCW 9A.32.050 in accord with the construction of the same language in State v. Leech, 114 Wash.2d 700, 790 P.2d 160 (1990) (involving the first degree felony murder provision). Also, the argument stresses, in 1966 the court noted in State v. Harris, 69 Wash.2d 928, 934, 421 P.2d 662 (1966), that the state's minority felony murder rule might need reform at some point in the future, and there were "nearly constant challenges" to assault as the predicate felony. Suppl. Br. on Behalf of Pet'r Ford at 17. Therefore, the argument goes, the prosecution was on notice that the statute was subject to change.[4]
¶ 24 But this argument rests on an incorrect understanding of the ends of justice exception and an undue emphasis by the parties and the Court of Appeals on whether Andress was expected, unsurprising, or foreseeable. As explained, the extraordinary circumstances required are unusual circumstances beyond the control of the State and extraneous to the action of the court or that go to the regularity of its proceedings. There is no requirement that the circumstances be unexpected, a total surprise, or unforeseeable. Contrary to the assumption of the parties and the apparent belief of the Court of Appeals, we do not agree that for the ends of justice exception to apply the State must have been blind to the possibility that the law might change. As in the case of the CR 60(b)(11), the focus is on whether the circumstances are truly unusual. In addition, CrR 4.3.1(b)(3) should be construed so that its purposes are served, and in some circumstances these purposes may be served regardless of whether a change in the law is expected.
¶ 25 We note, nonetheless, that while it might have been foreseen that the law would change at some point, given the comments in Harris, 69 Wash.2d at 934, 421 P.2d 662, it would also have been reasonable to think that when it came, "reform" would be prospective. It appears to us highly unlikely that prosecutors would have risked reversal and vacation of so many convictions if they expected an Andress-type decision applying to convictions stretching back over 25 years.
¶ 26 The Court of Appeals' decisions that the "ends of justice" exception applies in these cases is affirmed. Andress and its application to existing convictions satisfy the standard of extraordinary circumstances.
¶ 27 2. Other Issues Raised by the Defendants. In addition to the joinder issue, the defendants' raise other issues that are specific to their cases.

A. Mathews
¶ 28 Early in the morning on November 30, 1994, Gantry Mathews and his girlfriend Andrea Lambert went into a convenience store where Alisa Binongal and Simeon Villarosa were working, leaving Tysonia Green in the car. Binongal heard Villarosa cry out "no, no, friend, no," before he yelled at her to call 911. Tr. of Proceedings (Tr.) (Nov. 9, 2005) at 15. She saw Mathews with a gun in his hand. Villarosa grabbed Mathews' wrist, and as they struggled over the gun Mathews shot Villarosa once in the hand and then in the back. Villarosa died. A jury convicted Mathews of second degree felony murder based on second degree assault, as charged. After his conviction was vacated pursuant to Andress, the State charged and the jury *982 convicted Mathews of second degree intentional murder.
¶ 29 Mathews filed a pretrial motion to exclude evidence of his prior convictions and a photograph of Lambert sitting in his lap at the police station. The trial court granted the motions. A prosecution witness, Detective Kevin O'Keefe, introduced evidence excluded under these rulings. In response to a question on cross-examination, O'Keefe disclosed that after a detective learned Mathews' name, he began working on the name from a picture in a King County booking file. Defense counsel's immediate motion to strike the statement as nonresponsive was granted, and the court ordered the jury to disregard it. On redirect, O'Keefe was asked about a period when Lambert was in the room with Mathews at the police station, and he responded that after she was fingerprinted she was brought inside and she sat on Mathews' lap. Defense counsel again immediately objected and moved to strike. The trial court sustained the objection and told the jury that the way in which Lambert sat down was irrelevant, stricken, and the jury was to disregard it.
¶ 30 Defense counsel again moved for a mistrial. The trial court expressed concern that O'Keefe intentionally violated the pretrial rulings but questioned whether there was any prejudicial effect. The court delayed any ruling until the end of trial, and then denied the motion for a mistrial. On appeal, the Court of Appeals concluded that the irregularities were not serious and the trial court's actions in sustaining the objections and instructing the jury to disregard the evidence cured any prejudice.
¶ 31 Mathews contends that the witness misconduct violated his due process right to a fair trial.
¶ 32 A trial court's denial of a motion for a mistrial is reviewed for abuse of discretion. State v. Allen, 159 Wash.2d 1, 10, 147 P.3d 581 (2006); State v. Rodriguez, 146 Wash.2d 260, 269, 45 P.3d 541 (2002). A mistrial should be granted when the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will be tried fairly. State v. Greiff, 141 Wash.2d 910, 920-21, 10 P.3d 390 (2000). A denial of a motion for mistrial should be overturned only when there is a substantial likelihood that the prejudice affected the verdict. Id. at 921, 10 P.3d 390; see State v. Hopson, 113 Wash.2d 273, 284, 778 P.2d 1014 (1989) (only errors affecting the outcome of the trial are deemed prejudicial). Thus, when a trial irregularity occurs, the court must decide its prejudicial effect. "In determining the effect of an irregularity, [the court] examine[s] (1) its seriousness; (2) whether it involved cumulative evidence; and (3) whether the trial court properly instructed the jury to disregard it." Id.; see Greiff, 141 Wash.2d at 921, 10 P.3d 390.
¶ 33 The irregularities here are the statements by Detective O'Keefe that violate the court's pretrial ruling. A trial court has wide discretion to cure trial irregularities resulting from improper witness statements. State v. Post, 118 Wash.2d 596, 620, 826 P.2d 172 (1992). In some cases curative instructions have been held insufficient to remove prejudicial effect. Hopson, 113 Wash.2d at 284-85, 778 P.2d 1014. However, ultimately the question is "whether ..., viewed against the background of all the evidence," the improper testimony was so prejudicial that the defendant did not get a fair trial. State v. Thompson, 90 Wash.App. 41, 47, 950 P.2d 977 (1998). In the context of a given case it may be that improper evidence did not affect the outcome of the trial, and in such situations a trial court may deny a motion for a mistrial. Hopson, 113 Wash.2d at 285, 778 P.2d 1014; see Allen, 159 Wash.2d at 10, 147 P.3d 581 (when testimony is improper because it violates a pretrial order excluding certain evidence, the question is whether the improper testimony, when viewed in the context of all the evidence, deprived the defendant of a fair trial).
¶ 34 Turning first to the statements about the investigation beginning with the booking file, a violation of a pretrial order is a serious irregularity. Thompson, 90 Wash.App. at 46, 950 P.2d 977. An intentional introduction of inadmissible evidence relating to criminal history is more serious than an unintentional interjection of inadmissible testimony. See State v. Taylor, 60 *983 Wash.2d 32, 36-38, 371 P.2d 617 (1962) (a member of the King County police department deliberately injected evidence that the defendant had a parole officer and repeated it immediately when the defense motion for a mistrial was denied; a new trial was ordered after posttrial reargument). The fact the witness is a "professional" witness also indicates a serious irregularity. Id. at 36, 371 P.2d 617. Additionally, the testimony related to prior criminal conduct and testimony that the defendant already had a record and had stabbed someone was held to be extremely serious in State v. Escalona, 49 Wash.App. 251, 255, 742 P.2d 190 (1987). While O'Keefe's statement about a booking file did not identify any specific prior criminal conduct, as the State says, this was also true in Taylor, on which Mathews relies, where the witness intentionally interjected evidence that the defendant had a parole officer and intentionally repeated this statement. Detective O'Keefe's statement was not cumulative of other evidence. Finally, the trial court immediately gave curative instructions, and did so in a way that did not unduly emphasize the testimony. A jury is presumed to follow instructions. State v. Montgomery, 163 Wash.2d 577, 183 P.3d 267 (2008).
¶ 35 With regard to the photograph, the photograph itself was not introduced at trial. The testimony about it occurred in the context of a question about chronology that the State correctly characterizes as convoluted: "At what point in time was his contact with Miss Lambert that took place in your presence and lasts about five minutes in terms of the sequence of events?" Tr. (Nov. 10, 2005) at 47. The detective said: "Well, she was being fingerprinted and brought to the room. We brought her inside, Detective [Al] Lima and I were in the same room and she sat down in his lap. They talked." Id. This testimony was not cumulative, although the jury learned from other testimony that Lambert was Mathews' girlfriend and that police questioned both at the police station. The court immediately gave a curative instruction.
¶ 36 While the first statement in particular was a serious irregularity, the jury was instructed to disregard both statements. Given the curative instructions, and in the context of the trial as a whole and all the evidence, we conclude that Mathews was not deprived of a fair trial.
¶ 37 The evidence established that the first shot from Mathews' gun went through the victim's hand and was fired at a steep upward angle when the two were struggling on the floor. The second bullet was shot into Mr. Villarosa's back from a distance of three to five feet, muzzle to target, with four feet being most likely, given evidence about the powder pattern. The fact the shot was into the back, and from this distance, counters Mathews claim that he was defending himself. When Green drove them away from the store, Lambert screamed at Mathews, asking him why he shot the victim. Mathews replied, "because I'm a gangster," while smirking. Id. at 146-47. After Mathews and Lambert took a taxi to the house of one of Lambert's friends, Mathews reloaded the .44 Magnum he had fired. Green told police about the crime, and they arrested Mathews. He told police he threw the gun away, but they found the loaded gun, a bag of ammunition, and Mathews' bloody clothes in a closet in the friend's house.
¶ 38 At the police station, Mathews gave a taped statement, claiming that Mr. Villarosa had tried to take the gun from his pocket, a struggle ensued, and the gun went off as Villarosa tried to take it away. However, the State's firearms expert disputed this for the reasons mentionedthe victim was shot in the back from a distance of at least three feetand the gun was in good working order and required 11 pounds of trigger pull. Further, there was additional evidence indicating that Villarosa did not instigate the incident. Testimony established that store employees were instructed not to intervene in any criminal activity in the store. Ms. Binongal testified that she heard Villarosa say "no, no, friend, no" and then told her to call 911. Tr. (Nov. 9, 2005) at 15. She looked to the back of the store and saw Mathews had the gun in his hand. Villarosa grabbed Mathews' hands and tried to push the gun away. Binongal called 911, and the gun fired. She went to *984 the back room to continue the 911 call and as she did, she saw the two on the floor struggling. She heard a second shot and then nothing else.
¶ 39 The record supports the conclusion that the improper testimony did not, in the context of the entire trial, deprive Mathews of a fair trial. Accordingly, the trial court did not abuse its discretion in denying Mathews' motion for a mistrial.
¶ 40 Mathews next claims there is insufficient evidence to support his conviction. We disagree. The evidence summarized above is sufficient to support the conviction.
¶ 41 We affirm Mathews' conviction for second degree intentional murder.

B. Gamble
¶ 42 Jacob Gamble makes passing reference to double jeopardy in his petition for review, but fails to provide any argument on the issue. He did argue double jeopardy to the Court of Appeals, and that court correctly concluded there was no violation. State v. Gamble, 137 Wash.App. 892, 899-902, 155 P.3d 962 (2007). In a joint supplemental brief, he asks the court to consider issues raised in the petition for review and consider the briefing in the Court of Appeals. However, argument incorporated by reference to other briefing is not properly before this court, and we decline to further consider the assertion that double jeopardy principles have been violated. Saldin Sec., Inc. v. Snohomish County, 134 Wash.2d 288, 297 n. 4, 949 P.2d 370 (1998).
¶ 43 Gamble also contends that the trial court committed reversible error when it failed to give a lesser offense instruction on second degree manslaughter as he requested. A lesser offense instruction must be given if the elements of the lesser offense are necessarily included in the offense charged and the evidence supports an inference that the lesser offense was committed to the exclusion of the charged offense. State v. Workman, 90 Wash.2d 443, 447-48, 584 P.2d 382 (1978). First degree manslaughter is committed when a person recklessly causes the death of another person. RCW 9A.32.060(1)(a). Second degree manslaughter is committed when a person, with criminal negligence, causes the death of another person. RCW 9A.32.070. A person acts with criminal negligence "when he or she fails to be aware of a substantial risk that a wrongful act may occur and his or her failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation." RCW 9A.08.010(1)(d).
¶ 44 The trial court found there was no evidence to support the claim that Gamble acted with criminal negligence. The Court of Appeals affirmed, as do we. Gamble and a companion attended a party where his companion wanted to fight another young man. Daniel Carroll was a friend of the man Gamble's associate wanted to fight. Carroll tried to intervene on behalf of his friend after the friend was hit on the head with a beer bottle. Carroll was unarmed and considerably smaller than Gamble, who punched him as he went to his friend's aid. Carroll fell, hit his head on a concrete sidewalk, and as he lay there, not moving, Gamble and others kicked him. In a taped statement to the police, admitted at trial, Gamble said he got caught up in the moment and that he intentionally struck Carroll in the face. He knew Carroll landed on the sidewalk and he kicked Carroll in the head. He claimed he did not want to hurt Carroll. Mr. Carroll died as a result of the beating by Gamble and others. Gamble was charged, after his second degree felony murder conviction was reversed, with second degree intentional murder and first degree manslaughter, in the alternative. The jury found him not guilty of intentional murder, but guilty of first degree manslaughter.
¶ 45 Gamble's intentional conduct of punching the victim in the face, coupled with kicking him in the head when he was down and not moving, is not evidence that supports only criminal negligence and a manslaughter charge, regardless of Gamble's assertion that he did not want to harm the victim.
¶ 46 We uphold the Court of Appeals' determination that no error occurred when the trial court refused to give a lesser offense instruction, and affirm Gamble's conviction of first degree manslaughter.

*985 C. Harris
¶ 47 While staying at another person's house, along with several other persons, Rodney Harris had been smoking crack cocaine and observed two other men having a conversation at a table in another room. When one left the table, Harris stood and shot him three times. The victim died. Harris claimed that he thought the two men were going to assault him. He was charged with intentional murder and felony murder based on assault.
¶ 48 Harris' first trial ended in a mistrial on the murder charges. At his second trial he was convicted of second degree felony murder based on assault, with a firearm enhancement. On appeal, the conviction was reversed on the basis counsel was ineffective for proposing faulty self-defense instructions that were given to the jury.[5]State v. Harris, 122 Wash.App. 547, 90 P.3d 1133 (2004). Because Andress had been decided in the meantime, he could not be retried on the felony murder charge. The State charged him with intentional second degree murder and in the alternative first degree manslaughter. Following a bench trial on a stipulated record, he was convicted of first degree manslaughter with a firearm enhancement. The Court of Appeals affirmed. State v. Harris, noted at 135 Wash.App. 1029, 2006 WL 3077704 (2006).
¶ 49 Harris contends that his speedy trial rights were violated. He first contends that under former CrR 3.3 (pre-2001 amendments) he must have been brought to trial on the intentional second degree murder and manslaughter charges within 60 days after the mistrial was declared on January 11, 2001. This claim is tied to his mandatory joinder argument; he recognizes that if the mandatory joinder rule does not apply, there is no speedy trial problem.
¶ 50 Because the ends of justice exception excuses the failure to file these charges along with the second degree felony murder charge, the speedy trial period on the intentional murder and manslaughter charges did not begin when the mistrial was declared. We therefore reject Harris's court rule-based speedy trial claim because the mandatory joinder rule does not apply and the Court of Appeals counted the days with respect to each of his trials and correctly concluded that as to each of the trials there was no violation of his court rule speedy trial rights. Harris, 135 Wash.App. 1029, 2006 WL 3077704, at *4.
¶ 51 Harris also argues a violation of his constitutional rights to a speedy trial under the Sixth Amendment and article I, section 22 of the Washington State Constitution. He bases this argument on delay in charging him with the related crime of first degree manslaughter after he successfully appealed his conviction of second degree felony murder on the ground of ineffectiveness of counsel. Harris claims the State purposefully and oppressively delayed charging him. He argues that the delay was presumptively prejudicial, citing Doggett v. United States, 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). Again, Harris's claim rests on the ground that the State had to join all charges against him under the mandatory joinder rule, which, as explained, is not true. Further, his case is nothing like Doggett, where the defendant was indicted eight and one-half years after he was arrested.
¶ 52 As the Court of Appeals ruled, there was no violation of either Harris's rule-based or constitutional right to a speedy trial.
¶ 53 Harris also contends his equal protection rights were violated because the mandatory joinder rule has been applied to other defendants who were charged with second degree felony murder based on assault. Although he claims that he is similarly situated to the defendants in State v. Douglas, 128 Wash.App. 555, 116 P.3d 1012 (2005) and State v. Hughes, 118 Wash.App. 713, 77 P.3d 681 (2003), the Court of Appeals properly held that he has not shown that the circumstances in those cases are like his own. Harris, 135 Wash.App. 1029, 2006 WL 3077704, at *5. Accordingly, Harris has failed to establish a violation of his equal protection rights.
¶ 54 Finally, Harris makes a due process argument tied to the mandatory joinder argument *986 that is difficult to follow but does not, in any case, address the ends of justice exception, as the Court of Appeals correctly observed. Id. at *3.
¶ 55 We affirm Harris's conviction of first degree manslaughter.

D. Ford
¶ 56 Following vacation, on collateral review, of his second degree felony murder conviction, Leron Ford was found guilty after a stipulated facts trial of second degree intentional murder and first degree manslaughter, based on his having beaten his two-year-old daughter to death. The parties agreed the trial court should make a decision on each of these charges, and Ford agreed to a sentence on the manslaughter charge, if convicted of both charges, provided he was successful on his appeal of the mandatory joinder issue. He waived all other appeal rights. He was sentenced on the intentional murder conviction.
¶ 57 In addition to the ends of justice exception to mandatory joinder, the trial court determined that the new charges would also be allowed because Andress effectively erased the original conviction, i.e., pursuant to Andress the original charge never existed.[6] Ford complains this was error. The Court of Appeals did not address this issue and we decline to consider it because Ford waived all appeal rights except for the mandatory joinder issue. We note that, in any event, the issue is moot because the ends of justice exception to the mandatory joinder rule applies and allows the new charges.
¶ 58 We affirm Ford's conviction for second degree intentional murder.

E. Alexander
¶ 59 In 1991, James Alexander was charged with second degree felony murder of his 21-month-old son. A 300 month exceptional sentence was imposed. Alexander filed a personal restraint petition, and the conviction was vacated in light of Andress. In 2005, the State charged Alexander with homicide by abuse and alternatively with first degree assault. Initially, the trial court orally dismissed these charges and directed a verdict of first degree manslaughter in light of State v. Gamble, 118 Wash.App. 332, 72 P.3d 1139 (2003), where the Court of Appeals held, after reversing Gamble's second degree felony murder conviction, that manslaughter was a lesser offense of second degree felony murder and remanded for entry of judgment of guilty for this crime. Subsequently, this court reversed Gamble on the basis that manslaughter is not a lesser offense of second degree felony murder. State v. Gamble, 154 Wash.2d 457, 114 P.3d 646 (2005). The State's motion for reconsideration in Alexander's case was accordingly granted and the charges were reinstated. A jury convicted him of both crimes. The jury found aggravating circumstances, and the court imposed a 400 month exceptional sentence.
¶ 60 Alexander contends that the State's decision to file more serious charges after he successfully challenged his second degree felony murder conviction and the fact that he received a longer sentence than was originally imposed establish a presumption of prosecutorial vindictiveness and a violation of his due process rights.
¶ 61 "A presumption of vindictiveness arises when a defendant can prove that `all of the circumstances, when taken together, support a realistic likelihood of vindictiveness.'" Korum, 157 Wash.2d at 627, 141 P.3d 13 (quoting United States v. Meyer, 258 U.S.App. D.C. 263, 810 F.2d 1242, 1246 (1987)). The presumption may be rebutted by objective evidence justifying the prosecutorial action. Id. at 627-28, 141 P.3d 13.
¶ 62 The Court of Appeals rejected Alexander's argument because, even assuming the presumption arose (and it did not agree that one did), objective evidence justified the new charges. State v. Alexander, noted at 142 Wash.App. 1033, 2008 WL 176360, at *3 (2008). The court explained that at the time of the first trial Alexander's wife had recently arrived in the United States from the Philippines, spoke little English, and was *987 naive with respect to child care and appropriate discipline. Id. But when she was interviewed before the State filed new charges her English had improved and she was able to describe the history of the abuse and specific instances where inappropriate discipline had been inflicted. Id. The prosecutor concluded that in contrast to the circumstances when the first charges were filed, in 2005 there was sufficient evidence to establish the pattern of abuse necessary for a charge of homicide by abuse. Id.
¶ 63 The State urges us to follow this analysis, adding that the information it obtained from Alexander's wife about the abuse was not evidence satisfying the exception to the mandatory joinder rule based on new evidence, but it does help to show that the State's charging decision in 2005 was not vindictive. The State also says that the evidence did not support a charge of intentional murder and manslaughter was not an adequate charge under the circumstances; therefore it charged homicide by abuse. As to the length of the sentence, the State points out that it alleged aggravating factors in both trials, and that in the 2005 trial a jury found the aggravators had been proved. An exceptional sentence was imposed both times.
¶ 64 We conclude that vindictiveness has not been established, but do so on different grounds than the Court of Appeals. A prosecutorial action is vindictive only if it is designed to penalize a defendant for exercising protected rights. Korum, 157 Wash.2d at 627, 141 P.3d 13. The record does not support the conclusion that the State brought greater charges to penalize Alexander for asserting his rights. Rather, our decision in Andress required vacation of Alexander's conviction. The State then had to decide what charges to bring. Given the severity of the allegations, homicide by abuse was the only reasonable charge. The length of the sentence then flowed from the conviction and the jury's determination that aggravating factors existed.
¶ 65 Alexander next contends that the trial judge's refusal to grant his motion to recuse was error because of violations of the appearance of fairness doctrine. Under the appearance of fairness doctrine, a judicial proceeding is valid only if a reasonably prudent, disinterested observer would conclude that the parties received a fair, impartial and neutral hearing. State v. Bilal, 77 Wash.App. 720, 722, 893 P.2d 674 (1995). "'The law goes farther than requiring an impartial judge; it also requires that the judge appear to be impartial.'" State v. Madry, 8 Wash.App. 61, 70, 504 P.2d 1156 (1972), quoted in Post, 118 Wash.2d at 618, 826 P.2d 172. "Evidence of a judge's actual or potential bias must be shown before an appearance of fairness claim will succeed." State v. Chamberlin, 161 Wash.2d 30, 37, 162 P.3d 389 (2007); see also Post, 118 Wash.2d at 619, 826 P.2d 172. Under the Code of Judicial Conduct, designed to provide guidance for judges, "`[j]udges should disqualify themselves in a proceeding in which their impartiality might reasonably be questioned.'" CJC Canon 3(D)(1), quoted in Chamberlin, 161 Wash.2d at 37, 162 P.3d 389; see also State v. Dominguez, 81 Wash. App. 325, 328, 914 P.2d 141 (1996).
¶ 66 Alexander first argues that in a "pretrial" ruling the judge expressed a belief in his guilt. However, the comments occurred during the March 29, 2005, hearing when, in light of Gamble, 118 Wash.App. 332, 72 P.3d 1139, the trial judge dismissed the charges the State filed after reversal of Alexander's felony murder conviction. At this hearing the judge directed a verdict on charges of manslaughter, commenting on the nature of the offense and how the court was disturbed by the facts, involving as they did a father's abuse of his child. Alexander claims that because the media reported the statements, the judge's decision reinstating the charges shows bias based on a political motive.
¶ 67 The Court of Appeals determined that comments regarding the strength of the State's evidence outside the presence of the fact finder are not evidence of potential or actual bias. Alexander, 142 Wash.App. 1033, 2008 WL 176360, at *3; see State v. Carter, 77 Wash.App. 8, 888 P.2d 1230 (1995). Under the facts, we agree that there was nothing improper in the court's remarks at the time and in the context in which they were made. We also note that Alexander does not *988 provide evidence supporting his speculation about a political motive.
¶ 68 Alexander also claims the judge should have disqualified herself because she represented his ex-wife in a dissolution action involving Alexander while the original murder charges were pending against him and, he says, filed a restraining order against him.
¶ 69 While murder charges were pending against Alexander in August 1991, his wife filed a petition for dissolution. The judge at the 2005 trial was her attorney for purposes of obtaining temporary restraining orders protecting marital assets and an order to proceed in forma pauperis. The parties filed an agreed order dismissing the petition for dissolution in December 1991.
¶ 70 The judge said she had no recollection of the case and after reviewing the dissolution file, said that her representation was brief, that she never spoke to Alexander, and that the only orders she sought were as described. The record does not show any no-contact order or that the judge discussed anything having to do with the present case.[7]
¶ 71 While Alexander has produced evidence of potential bias, the representation occurred 14 years prior to the present case and the judge did not recall the prior representation. The remoteness of the representation and the fact the judge did not recall it lead us to agree with the result reached by the Court of Appealsthat Alexander has not established an appearance of unfairness.[8]
¶ 72 We affirm Alexander's conviction for homicide by abuse.

CONCLUSION
¶ 73 We affirm the Court of Appeals' determination in each of these cases that the mandatory joinder rule does not bar the new charges brought after the defendant's conviction was overturned under Andress because the ends of justice exception to the mandatory joinder rule applies. Because we find that none of the defendants' arguments on the individual issues they raise necessitate reversal, we affirm each of the defendants' convictions.
WE CONCUR: SUSAN OWENS, CHARLES W. JOHNSON, MARY E. FAIRHURST, GERRY L. ALEXANDER, JAMES M. JOHNSON, DEBRA L. STEPHENS and TOM CHAMBERS, JJ.
SANDERS, J. (dissenting).
¶ 74 CrR 4.3.1(b)(3) precludes retrying these defendants on related offenses unless an exception applies. I do not see how this situation falls into an exception since the prosecution could have pursued, but chose not to, related charges at the first trial.
¶ 75 Defendants were tried and convicted of felony murder based upon the underlying felony of assault. See former RCW 9A.32.050(1)(b) (effective July 1, 1976). At that time the prosecution did not charge possible related offenses, including second degree intentional murder, homicide by abuse, and manslaughter. The felony murder convictions were vacated because this court determined that felony murder could not be predicated on assault. See In re Pers. Restraint of Andress, 147 Wash.2d 602, 56 P.3d 981 (2002).[1] However after the felony murder convictions were vacated the prosecution charged the defendants with the related offenses so as to make them stand trial again for the same incident. The defendants moved to have those charges dismissed. CrR 4.3.1(b)(3) provides in part:
The motion to dismiss must be made prior to the second trial, and shall be granted unless the court determines that because the prosecuting attorney was unaware of *989 the facts constituting the related offense or did not have sufficient evidence to warrant trying this offense at the time of the first trial, or for some other reason, the ends of justice would be defeated if the motion were granted.
¶ 76 Here the prosecution does not even argue it lacked sufficient facts to pursue the related charges at the first trial. Certainly the prosecution could have brought the related charges but chose not to.
¶ 77 The majority excuses the prosecution's choice, trailblazing an expansion of the "for some other reason" exception, asserting this court's decision in Andress was "not within the control of the [prosecutor]" and "out of the ordinary." See majority at 979. This expansion is unsupported by the language and purposes of the rule and ignores that the operation of CrR 4.3.1(b)(3) is not contingent on the prosecutor's motive for not bringing related charges.
¶ 78 The phrase "for some other reason" does not permit a court to allow a prosecutor to bring later charges against a defendant for just any reason. When interpreting a general exception that completes a list of more specific exceptions, this court follows the principle of statutory interpretationejusdem generis. See, e.g., State v. Flores, 164 Wash.2d 1, 13, 186 P.3d 1038 (2008). The content and nature of the specific exceptions modify and restrict the meaning of the general exception. The general exception must be interpreted consistently with and relate to the specific exceptions.
¶ 79 Here the general "for some other reason" language does not entail the any-way-you-want-it catch-all exception envisioned by the majority. The specific exceptions cover circumstances where the prosecution lacks facts or evidence and thus cannot bring the related charges at the time of the first trial. See CrR 4.3.1(b)(3). Here, the prosecution was in no way precluded from bringing the additional charges; rather, the prosecution intentionally chose not to do so. This court's determination in Andress that assault does not constitute a basis for a felony murder charge has no relation to the specific CrR 4.3.1(b)(3) exceptions, which involve a prosecutor's factual ignorance and inability to bring related charges.
¶ 80 Furthermore, CrR 4.3.1(b)(3) is a limit on what the prosecution can do, regardless of the prosecution's motive for doing it. See State v. Dallas, 126 Wash.2d 324, 332, 892 P.2d 1082 (1995). The majority emphasizes that this court's determination in Andress was "not within the control of the [prosecutor]." Majority at 979. That is irrelevant. What was in the prosecutor's control was whether it would charge the related offenses. It could have done so, but did not.[2]
¶ 81 The prosecution now sees its choice not to bring additional charges as problematic since the initial convictions are no longer valid. The appropriate manner to address this problem is not to plow a line straight through CrR 4.3.1(b)(3), which protects defendants from multiple prosecutions based on the same conduct. See State v. Russell, 101 Wash.2d 349, 353 n. 1, 678 P.2d 332 (1984) (citing ABA Standards Relating to Joinder and Severance 19 (Approved Draft 1968)). The proper resolution is for the prosecution to pursue the related offenses at the time of the first trial if the prosecution wishes to secure convictions on those related offenses.
¶ 82 The majority attempts to justify its outcome-driven[3] articulation here by inexplicably limiting the application of CrR 4.3.1(b)(3) only to defendants acquitted by a jury. See majority at 979 ("The rule is intended to prevent the prosecution from trying *990 the defendant again for the same conduct if the jury acquits the first time. This did not happen in these casesnone of the defendants was acquitted by a jury."). But neither the language of CrR 4.3.1(b)(3) nor its underlying purposes support differentiating among retrying a defendant who has been convicted, acquitted by a jury, or has otherwise succeeded in having his or her conviction vacated. The majority cites no precedent for its made-up rule, snatched from thin air. The purposes of the rule "are to protect the defendants from (a) successive prosecutions that can act as a hedge against the risk of an unsympathetic jury at the first trial, (b) a `hold' on the defendant after the defendant has been sentenced, or (c) harassment of the defendant through multiple trials." Majority at 978; see also Russell, 101 Wash.2d at 353 n. 1, 678 P.2d 332 (citing ABA Standards Relating to Joinder and Severance 19). These protections do not hinge on the outcome of the defendant's first trial. CrR 4.3.1(b)(3) gives the prosecution one bite at the applean individual convicted at his or her first trial is no less free from further state harassment, coercion, or threat for the same conduct than an individual who is acquitted. A criminal trial provides finality, as best it can, for all parties involved.
¶ 83 Yet under the majority's rewrite of CrR 4.3.1(b)(3), see majority at 979, defendants who are not acquitted at their first trial are subject to subsequent prosecution for the same conduct at the whim of the State. The majority's outcome-driven resolution contradicts the language and purposes of CrR 4.3.1(b)(3). The majority does not serve the "ends of justice," it defeats them.
¶ 84 I dissent.
NOTES
[1] The prosecutors in these cases do not claim they were unaware of facts constituting the related offense or that they lacked sufficient evidence at the first trial.
[2] In Ford the court did not rely directly on Ramos I. Instead, it relied on the decision in Gamble, which in turn relied on Ramos I.
[3] Defendant Ford mistakenly maintains that in Anderson I the court had held that the statute under which the defendant had originally been charged had been declared "infirm, based upon caselaw from other states interpreting similar provisions as far back as the late 1800's, as well as a similar case decided by this Court [in] 1947." Suppl. Br. on Behalf of Pet'r Ford at 10. But the court did not find the statute "infirm," or invalid, Rather, it held that RCW 9A.32.030(1)(b), as amended in 1975, applied the same as the predecessor statuteit did not apply if the "extreme indifference" was directed toward one person, the victim. Anderson I, 94 Wash.2d at 186-90, 616 P.2d 612.
[4] The decision in Andress rested in part on the analysis in Leech and also on the belief that the legislature could not have intended the extreme harshness of the rule that had become more apparent as other cases were decided. That is, manslaughter charges are not lesser degrees of second degree felony murder and, where assault is the predicate, it would be unlikely that an instruction on assault as a lesser offense could be given because the assault results in the death and therefore the evidence would not support the conclusion that only the lesser offense was committed. Andress, 147 Wash.2d at 613, 56 P.3d 981 (citing State v. Tamalini, 134 Wash.2d 725, 953 P.2d 450 (1998)). Thus, if the State elected to charge second degree felony murder the jury would ordinarily have no choice but to convict or acquit. Andress, 147 Wash.2d at 613-14, 56 P.3d 981.
[5] The State incorrectly claims that the court did not find ineffectiveness of counsel. See State v. Harris, 122 Wash.App. 547, 551-52, 553-55, 90 P.3d 1133 (2004).
[6] This court determined in Hinton, 152 Wash.2d at 859-60, 100 P.3d 801, in accord with the general rule, that the interpretation of the felony murder provision in Andress was what the statute had meant from the time the revisions to the statute were effective in 1976.
[7] In his brief to the Court of Appeals, Alexander refers to what he says are statements in the transcript of his first trial allegedly showing that his wife's attorney met with Alexander in connection with the dissolution matter, but no such statements appear as cited.
[8] Finally, Alexander challenges the "Blakely-fix" statute, former RCW 9.94A.537 (2005), as a violation of his Sixth Amendment right to a jury trial, but does so only to exhaust issues for purposes of a federal habeas corpus petition. He concedes this claim was rejected in State v. Pillatos, 159 Wash.2d 459, 150 P.3d 1130 (2007).
[1] The legislature amended RCW 9A.32.050(1)(b) (effective Feb. 12, 2003) to expressly include assault.
[2] The prosecution no doubt had various strategic reasons for charging only felony murder based on assault. For instance, felony murder does not require a showing of an intent to kill, but only an intent to commit the underlying felony. Also, perhaps in these situations, securing one conviction at trial appeared easier or more likely than securing multiple convictions. But CrR 4.3.1(b)(3) protects defendants from multiple prosecutions for the same conduct regardless of the prosecution's motive in choosing not to seek initial convictions on multiple charges. See Dallas, 126 Wash.2d at 332, 892 P.2d 1082.
[3] The majority's first step down the outcome-driven primrose path is clear: "[T]hese defendants would never have any viable homicide charges brought against them, as a legal matter, for the deaths they caused if the mandatory joinder rule were to apply and bar any additional homicide charges." Majority at 979.