FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2013 NOV 18 AM 9: 03



IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 69059-1-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| RYAN ANDREW STEPHENSON, | ) | |
| | ) | |
| Appellant. | ) | FILED: November 18, 2013 |

SCHINDLER, J. — A jury found Ryan Andrew Stephenson guilty of first degree rape and assault of a child in the first degree. The jury returned special verdicts finding the aggravating circumstances that the 21-month-old victim was particularly vulnerable, that Stephenson used a position of trust to facilitate the assault, and the special allegation that the rape victim was under 15 years of age. We conclude that the trial court properly denied Stephenson's request to instruct the jury on the lesser-degree offense of assault of a child in the second degree and that a handwritten notation on the judgment and sentence did not prohibit the Department of Corrections from awarding early release credits. Stephenson's statement of additional grounds raises no meritorious issues. We therefore affirm.

FACTS

Ryan Andrew Stephenson met Sarah Johnson in 2002 and the two lived together intermittently for several years. In 2006, the couple had a son, O.E.J. In

2009, while the couple was separated, Johnson had a daughter, E.R.J., with another man. E.R.J.'s father moved out of Johnson's apartment after Stephenson threatened him.

Stephenson moved back into Johnson's Oak Harbor apartment in about March 2011. He often became upset when E.R.J. showed affection for Johnson and would move her away from her mother. Stephenson characterized E.R.J. as a "flee [sic] or tick" because she was "all over" Johnson.

In May 2011, Stephenson planned to relocate to Texas. On May 27, the last day that he was supposed to be in the apartment, Johnson left for an appointment at about 7:00 a.m. and asked Stephenson to care for the two children.

At about 9:30 a.m., Stephenson called Johnson and said that E.R.J. was bleeding and hurt and needed to go to the hospital. Stephenson added that "I didn't do it," and explained that he had heard "a bunch of banging and thud and jumping around" while the children were playing in O.E.J.'s room. Stephenson checked on the children and thought they were fine but later discovered that E.R.J. was bleeding when he changed her diaper.

Johnson called her parents Clifford and Linda Johnson, who drove to the apartment to check on E.R.J. Linda found Stephenson sitting on a chair in the darkened apartment rocking back and forth. E.R.J. was lying nearby on the floor with a pillow under her head. E.R.J. was unable to keep her eyes open and her hands felt

2

like ice. There were bloody wash cloths in E.R.J.'s diaper and Linda noticed "blood coming out of her from the front."

Stephenson said that the children had been playing "really hard." At some point, Stephenson heard E.R.J. scream and discovered blood in her diaper. Clifford heard Stephenson say something like, "them assholes will pin this on me."

The Johnsons drove E.R.J. to the hospital emergency room. E.R.J. was airlifted to Harborview Medical Center for surgery.

Oak Harbor Police Department detectives Anthony Slowik and Carl Seim arrived at Johnson's apartment at about 12:30 p.m. Stephenson told the detectives that he had been expecting them and agreed to talk.

Stephenson initially told the detectives that he had heard "a thud type of noise" while the children were playing and discovered E.R.J.'s injuries. Eventually, Stephenson explained that after Johnson's parents had left, he had confronted O.E.J., who admitted that he had put something "in [E.R.J.]'s butt." When the detective expressed skepticism about this possibility, Stephenson suggested that O.E.J. might have undressed E.R.J., injured her, and then put her diaper and pajamas back on.

As the interview continued, Stephenson revealed that he had been playing with E.R.J. by throwing her up in the air and stretching her legs to the side. At some point, Stephenson "accidentally stretched her legs too far apart" but did not intend "for things to happen." Stephenson finally acknowledged that he was "pretty sure" he

3

had caused E.R.J.'s injuries and concluded the interview stating, " 'I'm willing to admit I somehow hurt her even sexually. Purposefully, no.' " The detectives arrested Stephenson.

During the course of several interviews and two written statements, Stephenson provided varying but increasingly violent accounts of the incident. In the final version, he told one detective that he had gotten frustrated when E.R.J. did not finish her breakfast quickly enough. Stephenson then removed E.R.J. from her chair, placed her over his knee, and began punching her with a closed fist on her "butt." Stephenson said that he hit E.R.J. hard enough to cause her to defecate.

After changing E.R.J.'s diaper, Stephenson folded her legs against her torso and pushed her head-first into a backpack. He grabbed the backpack by a strap, swung it around a few times, and then threw it towards the couch. The backpack landed on the edge of the couch and fell to the floor, with E.R.J. crying and screaming inside. Stephenson then walked over to the backpack and kicked it "as hard as he could, like a soccer-style kick," five to seven times. Stephenson became so hot and sweaty from throwing and kicking the backpack that he had to change his clothes.

Sometime later, Stephenson found E.R.J. in O.E.J.'s room. When she did not move quickly enough, he became angry, carried her downstairs, and punched her about 20 times in the "butt area" with his closed fist. Stephenson noticed blood when he changed E.R.J.'s diaper and called Johnson.

Stephenson also described two prior incidents in which he had inserted a travel toothbrush container and a toothbrush into E.R.J.'s anus. Stephenson thought it would be "funny" to keep E.R.J. up all night so that she would sleep during the day. He suggested that E.R.J.'s current injuries might have been the result of these prior incidents and the beating she received on May 27. Stephenson told detectives "that if there was any semen found on [E.R.J.]'s body, it would be his."

E.R.J. had extensive bruising on her face, abdomen, back, hip, and buttocks. Her perineum was completely torn from the vagina to the anus. Julia Mitzel, a Harborview nurse practitioner, described the injury as the "most severe genital injury" that she had ever seen.

Dr. Rebecca Weister, medical director of the Harborview Sexual Assault and Traumatic Stress Center, described E.R.J.'s injury as a fourth degree episiotomy that resulted from penetrating trauma, not blunt trauma such as punching or kicking. According to Dr. Weister, the force of an adult male kicking a backpack containing a 21-month-old child could likely cause serious permanent disfigurement, significant permanent loss or impairment of a bodily part, significant permanent loss or impairment of an organ, and bodily injury that causes a likelihood of death.

The State charged Stephenson with one count of first degree rape with the special allegation that the victim was under 15 years of age, and one count of assault of a child in the first degree for the incidents occurring on May 27, 2011. The information also alleged as aggravating circumstances that E.R.J. was particularly

5

vulnerable on both the rape and assault counts, and that Stephenson used a position of trust to facilitate the assault.

The defense proposed a lesser-degree instruction on assault of a child in the second degree. The trial court denied the requested instruction, concluding that the evidence failed to support a rational inference that Stephenson "committed only the inferior degree offense to the exclusion of the greater offense."[1]

The jury found Stephenson guilty as charged and entered special verdicts finding that the State had proved the special allegation and the aggravating circumstances. The court sentenced Stephenson to exceptional sentences of 35 years to life for the rape and 25 years for the assault. The court found that the offenses arose from "separate and distinct criminal conduct . . . and both counts are serious violent offenses," and ordered the terms to be served consecutively under RCW 9.94A.589(1)(b).

## ANALYSIS

### Lesser-Degree Instruction

Stephenson contends that the trial court erred in refusing to give his proposed instruction on the lesser-degree offense of second degree assault of a child. To convict Stephenson of first degree assault of a child as charged here, the State was required to prove, among other things, that he assaulted E.R.J. with "intent to inflict great bodily harm . . . by any force or means likely to produce great bodily harm or

---

[1] (Emphasis in original.)

6

No. 69059-1-I/7

death." RCW 9A.36.120(1)(a); RCW 9A.36.011(1)(a). Based on evidence that he was thinking about E.R.J.'s father during the assault and did not intend to hurt E.R.J., Stephenson argues a rational juror could have found that he lacked the intent to inflict great bodily harm and find him guilty of second degree assault "to the exclusion of first degree assault."

> A criminal defendant is entitled to an instruction on a lesser-degree offense if
>
> (1) the statutes for both the charged offense and the proposed inferior degree offense proscribe but one offense; (2) the information charges an offense that is divided into degrees, and the proposed offense is an inferior degree of the charged offense; and (3) there is evidence that the defendant committed only the inferior offense.

State v. Fernandez-Medina, 141 Wn.2d 448, 454, 6 P.3d 1150 (2000)[2] (quoting State v. Peterson, 133 Wn.2d 885, 891, 948 P.2d 381 (1997)). We review the evidence in the light most favorable to the party requesting the instruction. Fernandez-Medina, 141 Wn.2d at 455-56. But the evidence must establish that the defendant committed only the lesser offense—"it is not enough that the jury might disbelieve the evidence pointing to guilt." Fernandez-Medina, 141 Wn.2d at 456.

The State concedes that the legal prong of the lesser-degree test was satisfied here. The factual prong of the test is "more particularized than that required for other jury instructions." Fernandez-Medina, 141 Wn.2d at 455. Consequently, the evidence "must raise an inference that only the lesser included/inferior degree

---

[2] (Internal quotation marks omitted.)

7

offense was committed to the exclusion of the charged offense." Fernandez-Medina, 141 Wn.2d at 455.[3]

Stephenson contends that several statements he made to police supported giving the requested instruction. During his interview at Johnson's apartment, Stephenson initially claimed that he had no idea how E.R.J.'s injuries occurred, but eventually said, " 'I'm willing to admit I somehow hurt her, even sexually. Purposely, no.' " In a written statement dated May 29, Stephenson described how he had beaten E.R.J. with his fist, put her in the backpack, spun the backpack around, tossed it toward the couch, then "kicked it a couple times" and a short time later, "beat her butt again several times" before he noticed that there had been a "major accident," and that he "had gone too far [and E.R.J.] wasn't supposed to be hurt like this." During another interview, Stephenson admitted that he had thought about E.R.J.'s father while he was kicking the backpack. Stephenson maintains that these statements support an inference that he lacked the requisite intent to inflict great bodily harm.

Stephenson's assertions that he "had gone too far," that there had been a "major accident," and that E.R.J. "wasn't supposed to be hurt like this" cannot be viewed in isolation. In determining whether to give a lesser-degree instruction, the trial court must consider all of the evidence that is presented at trial. Fernandez-Medina, 141 Wn.2d at 456. Consequently, Stephenson's comments must be

---

[3] (Emphasis in original.)

considered in conjunction with his admissions that he began the assault by intentionally punching E.R.J. in the groin, sufficiently enough to cause her to defecate, before folding E.R.J.'s legs against her torso and pushing her head-first into the backpack. Stephenson admitted picking up the backpack by a strap and while E.R.J. screamed inside, shaking it, swinging it around, and throwing it toward the couch where it fell on the floor. Stephenson then kicked the backpack five to seven times, "as hard as he could, like a soccer-style kick." Later, when E.R.J. appeared to be asleep in O.E.J.'s room, Stephenson brought her downstairs and "punched her at least 20 times with a closed fist in the butt area." At this point, Stephenson claimed he first discovered E.R.J.'s injuries when he changed her diaper.

When viewed together with his admitted intentional actions and the State's other evidence, Stephenson's statements do not support a rational inference that he committed only assault of a child in the second degree to the exclusion of any intent to inflict great bodily harm. Cf. State v. Gamble, 168 Wn.2d 161, 182, 225 P.3d 973 (2010) (defendant's admitted intentional conduct of punching and kicking the victim was not evidence that supported only a criminal negligence and manslaughter charge "regardless of [the defendant]'s assertion that he did not want to harm the

victim"). The trial court did not err in refusing to give Stephenson's proposed second degree assault instruction.[4]

Handwritten Notation on the Judgment and Sentence

Stephenson contends the trial court erred by noting "60 year minimum ordered by court" in the judgment and sentence. Relying on In re Personal Restraint of West, 154 Wn.2d 204, 110 P.3d 1122 (2005), Stephenson asserts that the Department of Corrections (DOC) will likely construe the provision as prohibiting the award of any early release time credit. We disagree.

In West, the defendant signed a written waiver of her earned early release time as part of a plea agreement. West, 154 Wn.2d at 207-08. The trial court entered a handwritten notation on the judgment and sentence providing that " 'defendant stipulates to flat time—no earned early release.' " West, 154 Wn.2d at 208. The DOC read the provision as prohibiting the application of earned early release. West, 154 Wn.2d at 209. Our Supreme Court concluded that the trial court lacked authority to restrict the application of earned early release and ordered the notation stricken from the judgment and sentence. West, 154 Wn.2d at 215-16.

Here, the trial court's notation merely summarized the total length of Stephenson's exceptional sentence. Unlike West, the court's notation does not even refer to earned early release. Stephenson's suggestion that the DOC might construe

---

[4] Because the evidence did not support giving the lesser-degree instruction, we need not address Stephenson's contention that defense counsel was constitutionally deficient for failing to correctly articulate the factual basis for the proposed second degree assault instruction.

No. 69059-1-I/11

the notation as a limit on its authority to award earned early release is not persuasive. We find no error.

Statement of Additional Grounds for Review

In his statement of additional grounds for review, Stephenson expresses regret for E.R.J.'s severe injuries and offers yet one more explanation for how some of her injuries could have occurred. He also asserts that he should have received treatment for his anger issues before the offenses occurred. Many of Stephenson's allegations rest on matters outside the record and therefore cannot be addressed on direct appeal. See State v. McFarland, 127 Wn.2d 322, 337-38, 899 P.2d 1251 (1995). In any event, because he has not sufficiently identified "the nature and occurrence of [the] alleged errors," we will not consider them. RAP 10.10(c).

Affirmed.

WE CONCUR:

11