# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 56993-1-II |
| Respondent, | |
| v. | |
| JAY D. DOUGLAS, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—While living with her aunt, 12-year-old DH was introduced to Jay Douglas. The aunt brought DH to Douglas' business several times, where Douglas molested DH. On one occasion at Douglas' home, DH and her aunt tried on lingerie in front of Douglas, he took photographs of them, and then he forced DH to have sexual intercourse with him. DH eventually disclosed these events to doctors and a child forensic interviewer. Police later found photographs of DH in lingerie on Douglas' computer.

Relevant to this appeal, the State charged Douglas with second degree child rape, two counts of second degree child molestation, and second degree possession of depictions of a minor engaged in sexually explicit conduct. Before Douglas' trial, the trial court admitted evidence of Douglas' prior sexual encounters with adult women who dressed in lingerie he provided before he took photographs of them and had sexual intercourse with them. The trial court also admitted other evidence over defense counsel's objections. The trial court denied defense counsel's motion for mistrial after Douglas' jail mate, Adan Alvarez, testified that Douglas said he burned down his

business, possibly to conceal evidence, and gave drugs to DH. The trial court immediately instructed the jury to disregard these comments and later instructed the jury to disregard all of Alvarez's testimony.

A jury found Douglas guilty on all counts, and the trial court sentenced him to 280 months to life and imposed several fees. Douglas and his attorney appeared from different locations during sentencing, Douglas appeared in custody and his attorney appeared remotely.

On appeal, Douglas argues that the trial court abused its discretion by denying his motion for mistrial based on Alvarez's comments, and that the prosecutor committed misconduct by eliciting Alvarez's testimony. Douglas also argues that the trial court erred by admitting evidence of his prior sexual encounters with adult women because it was improper propensity evidence. Additionally, Douglas challenges multiple other evidentiary rulings, arguing that even if these irregularities are harmless, his conviction should be reversed due to cumulative error. Douglas also contends that the trial court denied his right to counsel during sentencing because he could not privately confer with his attorney, though he did not object to this below. Finally, Douglas argues, and the State concedes, that some of the imposed fees should be reversed.

We remand to strike the challenged fees but otherwise affirm.

FACTS

I. BACKGROUND

DH[1] had a very difficult childhood; she moved between various family members and experienced homelessness and abuse. When DH was 12 years old, she moved in with her aunt,

---

[1] In this opinion, we use DH's initials at the time of the incident. Her name has since changed.

Heather Hughes. About a month later, Hughes introduced her to Douglas, with whom Hughes had a sexual relationship.

After moving in with another aunt, DH disclosed to Dr. Jennifer Hollinger, a pediatrician, that Douglas had touched her inappropriately and taken photographs of her in "'provocative clothing.'" 2 Verbatim Rep. of Proc. (VRP) at 616 (quoting record). Dr. Hollinger informed child protective services about DH's disclosure. DH later told a child forensic interviewer and a different doctor, Dr. Kimberly Copeland, that Douglas had inserted his penis in her vagina.

Police arrested Douglas and interviewed him. Police found a chest of lingerie items in Douglas' bedroom. On Douglas' work computer, police found five images of DH in similar lingerie items, and they later deduced that the photographs were taken in Hughes' bedroom. Douglas failed to appear for two hearings while out on bail.

## II. PRETRIAL MOTIONS

The State charged Douglas with second degree child rape, two counts of second degree child molestation, second degree possession of depictions of a minor engaged in sexually explicit conduct, two counts of bail jumping, and possession of a controlled substance with intent to manufacture or deliver.

Before trial, defense counsel moved to prevent the State and its witnesses from vouching for the credibility of any other witness, including whether DH was telling the truth about her allegations against Douglas. The trial court granted this motion.

In its pretrial motions, the State sought to introduce evidence of Douglas' prior sexual encounters with adult women other than Hughes under ER 404(b). Defense counsel moved to exclude this evidence. The State argued that evidence Douglas entertained women at his house,

3

would have them dress in lingerie that he provided, and eventually engaged in sexual acts with them was "probative of similar acts that occurred with the victim." 1 VRP at 37. The State contended that this evidence was more probative than it was prejudicial. Defense counsel argued that this was inadmissible propensity evidence under ER 404(b), which prohibits admission of a witness's other crimes, wrongs, or acts to show propensity unless they demonstrate evidence of a common plan or scheme.[2] *See State v. Gresham*, 173 Wn.2d 405, 421-22, 269 P.3d 207 (2012). Defense counsel stated that consensual sexual intercourse with adult women was distinguishable from "grooming a minor, getting her to dress up in similar outfits, and then forcibly raping her." 1 VRP at 40. Thus, the evidence was not sufficiently probative to outweigh its potential prejudice to Douglas.

The trial court denied defense counsel's motion to exclude evidence of Douglas' prior sexual encounters with adult women other than Hughes, and granted the State's motion to admit this evidence. The trial court concluded that the evidence was sufficient to demonstrate Douglas had "a common scheme or plan" under ER 404(b). 1 VRP at 43. The trial court also concluded that this evidence was more probative than prejudicial, though it did not further explain this conclusion.

Before trial, the State also requested that the trial court admit a photograph of Douglas from his arrest after his second bail jumping charge. The State promised to obscure the part of the photograph that showed Douglas' hands in handcuffs, acknowledging that such imagery could be

---

[2] The exception outlined in ER 404(b) allows for admission of "other crimes wrongs, or *acts*" that demonstrate evidence of a common plan or scheme. ER 404(b) (emphasis added). Thus, evidence of Douglas' prior consensual sexual activity with adult women need not be misconduct to be covered by this rule.

prejudicial. The State explained that this photograph was relevant because it depicted Douglas in a blue robe with no shirt underneath, which is what DH said Douglas was wearing when she was at his home. Defense counsel objected to the photograph, expressing concern that the State's modifications would not be sufficient to obscure the fact that Douglas was handcuffed. Additionally, defense counsel noted that the photograph was taken almost a year after DH's allegations, so the relevance of the photograph was minimal and police could simply testify to finding a blue robe at Douglas' home. The trial court deferred ruling on the admissibility of the photograph until the State made its modifications.

### III. TRIAL

Douglas' case proceeded to jury trial. The trial court segregated the charges and held a separate trial for the two bail jumping charges and the possession of a controlled substance charge. The details of that trial are not relevant to this appeal. The trial court later dismissed the possession of a controlled substance charge upon a motion from the State.

A.      Photograph of Douglas' Arrest

Before presenting any testimony, the State again offered into evidence the photograph of Douglas being arrested. The State had cropped out the bottom section of the photograph so Douglas' hands were not visible. Defense counsel again argued that the photograph should not be admitted because, even in the cropped version, the way Douglas was "hunched over with his hands in front of him . . . probably isn't natural unless there's handcuffs or he's holding on to something down there." 1 VRP at 338. Defense counsel claimed that the jury could still guess Douglas was in handcuffs in the cropped photograph. The trial court acknowledged that Douglas was in an unnatural pose, but admitted the photograph after concluding that it was more probative than

5

prejudicial. A reflection of a police car in a window is also visible in the photograph, though neither party discussed this fact during trial nor argued that it was part of the reason the trial court should not admit the photograph.

B.      DH's Testimony

During trial, DH testified that the first time she met Douglas, they only shook hands. DH said the second time she met Douglas, Hughes took DH to Douglas' workplace, which was a car lot that he owned. DH stated that while at the car lot, Hughes told Douglas to inspect DH's breasts, and Douglas touched DH's breasts over her shirt. Hughes pulled up DH's shirt and bra, and Douglas touched DH's breasts again.

DH testified that about a week later, Hughes brought DH to Douglas' car lot again. DH said that she and Hughes went to Douglas' office, and Hughes began to perform oral sex on Douglas while he was seated at his desk. DH stated that while this was occurring, Douglas beckoned DH over to him, unzipped DH's pants, and put his fingers inside her vagina. DH testified that she could not remember what happened after this event and her next memory was waking up at Hughes' house the following day.

According to DH, about a week later, Hughes took DH to Douglas' house. DH remembered that she ate pizza and drank soda, and soon after she "got pretty drowsy and the room was spinning." 1 VRP at 401. DH said that she felt like she was "going to fall down" and was "just trying to stay sitting up." *Id.* DH testified that after eating, Hughes and Douglas took DH to Douglas' bedroom, where Hughes and DH put on lingerie provided by Douglas. DH said that Douglas took pictures of them in the lingerie. DH testified that during this interaction, Douglas was wearing a blue robe with nothing underneath it.

6

DH testified that Douglas then asked Hughes to leave the room. DH stated that Douglas pushed DH down onto the bed, pinned her hands, and inserted his penis in her vagina. Again, DH did not remember the rest of the day of this event and only recalled waking up the next morning in her bed at Hughes' house.

Also around this time period, DH said that Hughes took pictures of DH posing in lingerie at Hughes' house. DH testified that after her interactions with Douglas, she attempted to run away from Hughes' house.

DH eventually moved in with a different aunt who took her to see a doctor. DH testified that she was afraid to tell this doctor about any sexual intercourse because she was worried that her family members would blame her or physically abuse her if they found out what happened with Douglas.

C.      Dr. Hollinger's Testimony

The first doctor that DH spoke to, Dr. Hollinger, testified that DH said she was unsure if she had had sexual intercourse but disclosed that Hughes' friend touched her inappropriately. According to Dr. Hollinger, DH said Hughes would bring her to Douglas' car lot, where DH "'was asked to dress up in provocative clothing and take pictures by herself'" and with Douglas. 2 VRP at 616-17 (quoting record). DH also informed Dr. Hollinger that Hughes would sometimes give DH melatonin gummies to help her sleep. Dr. Hollinger also said that DH told her one time she woke up to Hughes yelling at a male friend and pulling DH out of the situation. Dr. Hollinger reported DH's disclosures to child protective services.

D.    Child Forensic Interviewer's Testimony About First Interview

DH then spoke with a child forensic interviewer. DH told the forensic interviewer that Hughes would take her to Douglas' car lot and home and "they would take photographs of her. They would participate in sex acts in front of her and eventually leading to sex acts with her." 2 VRP at 842. DH said she was forced to dress up in "'skimpy things that married people wear'" and pose for photographs. *Id.* (quoting record). DH also told the forensic interviewer that she had foggy or missing memories of some events because "she would always have something to eat or drink and she often felt weird afterwards." 2 VRP at 842-43. During this interview, DH did not tell the child forensic interviewer about any sexual intercourse.

E.    Dr. Copeland's Testimony

DH saw another doctor, Dr. Copeland, after being referred due to sexual assault concerns. DH told Dr. Copeland that Hughes and Douglas took photographs of her in lingerie while at Douglas' house. DH said that Douglas was wearing a robe during this interaction. Dr. Copeland testified that DH told her Douglas put his penis in her vagina, and Hughes made him stop because DH was crying. DH said that she lightly bled for a couple of days after this interaction.

Dr. Copeland performed a vaginal exam on DH and the results were normal. Dr. Copeland testified that only in very few cases would a child have an irregular exam more than several days after sexual intercourse because the hymen can heal very quickly.

During trial, the State and Dr. Copeland had the following exchange:

[STATE]: Do children always tell what's going on in their lives?

[DEFENSE COUNSEL]: Objection, Your Honor –

[STATE]: Generally.

8

[DEFENSE COUNSEL]: -- again, I don't know how she would know that.

THE COURT: I'll allow the question, just -- please just rephrase it again.

[STATE]: Generally, do children always tell everything that's going on in their lives?

[DOCTOR]: So, I think that I don't know that, but I -- *when kids come to me, I assume they're coming and being truthful because they're seeing a physician* I --

[DEFENSE COUNSEL]: Objection, Your Honor; move to strike.

THE COURT: Any response?

[STATE]: I don't know what the objection is for.

[DEFENSE COUNSEL]: The objection is for an opinion that was provided.

THE COURT: I -- I'll allow. I'll allow the testimony. Doctor, go ahead and finish your comment.

[DOCTOR]: Thank you. I was just saying that when kids -- in answer to your question: do they tell me everything? I don't have any way of knowing that, and I doubt it. I'm seeing them on a limited time period. I'm seeing them on a limited scope about their life.
　　　　But I do make the assumption, and I have for my whole career in medicine, that when someone comes to the physician --

[DEFENSE COUNSEL]: Objection, Your Honor, to the opinion that's going to be provided as to veracity.

[STATE]: I don't believe that, at this point, there is an opinion being proffered. She's discussing her approach and what she assumes in her approach to treating these children.

THE COURT: I'm going to overrule the objection.

2 VRP at 716-18 (emphasis added). The doctor then explained that when interviewing children and taking their history, she "take[s] the history at surface value. I don't have any reason to do anything differently." 2 VRP at 718.

9

F.       Child Forensic Interviewer's Testimony About Second Interview

After her appointment with Dr. Copeland, DH met with the child forensic interviewer again. During this second interview, DH told the forensic interviewer that Douglas inserted his penis in her vagina. DH said she disclosed this during the second interview because DH had already talked to the forensic interviewer and could now trust her.

G.       Officer's Testimony About Douglas' Adult Sexual Encounters

During trial, a police officer testified about Douglas' interview. The officer testified that Douglas said DH came to his house with Hughes. Douglas described DH as a "typical," "attention starved" teenager. 2 VRP at 531. Douglas stated that Hughes and DH tried on lingerie in his bedroom and bathroom while he sat on his bed. The officer testified that Douglas' answers about his interactions with DH during this interview were inconsistent. Initially, Douglas stated that he did not touch DH, but later he claimed that he hugged DH and she tried to sit on his lap.

The officer also testified that Douglas confirmed he had received "racy" images of DH from Hughes and knew they were inappropriate but did not think they were illegal. 2 VRP at 535. Police found five images of DH in lingerie on Douglas' work computer, and they later deduced that the photographs were taken in Hughes' bedroom. The officer testified that the lingerie found in Douglas' bedroom was the same or similar to the lingerie DH wore in these photographs.

The State asked the officer what Douglas said about other occasions when women were over at his house. The officer replied that Douglas said the women would "come over and would dress up" in lingerie that he provided "for sexual activity playtime." 2 VRP at 527. The officer stated that Douglas estimated the women were anywhere from 24 to about 50 years old. The officer

testified that Douglas said his sexual interactions with these women were photographed or videotaped. Douglas would keep the pictures on his work computer.

During this interview, Douglas also told the officer that he bought an inexpensive cell phone for DH.

H.      Officer's Testimony About Other People with Warrants in Douglas' House

While cross-examining the same officer, defense counsel asked several questions about the circumstances of Douglas' arrest. Specifically, defense counsel elicited testimony that the officer arrested Douglas in his bedroom while he was only wearing a robe and did not allow Douglas to put on any other clothing except for shoes.

While the jury was recessed, the State expressed concern that defense counsel had "colored [the officer] . . . as an insensitive man who [was] unwilling to provide [Douglas] with the bare necessities to cover himself up." 2 VRP at 593-94. The State explained that it wanted to elicit testimony that the officer did not allow Douglas to get fully dressed because there were two other people in the house with outstanding warrants. Defense counsel said that the State could explain that there were other people in the house with Douglas that presented a safety concern, but argued that it was unnecessary to state that these people had outstanding warrants.

The trial court allowed the State to elicit testimony that the other people in Douglas' home at the time of his arrest had warrants. The trial court stated, "[T]he testimony that the other two individuals were on warrant status, the officers knew that, and they had to remove people very carefully I think is appropriate and explains the situation sufficiently." 2 VRP at 596. The officer then testified that he went to Douglas' house to "arrest people on warrants" and found two people with warrants "hiding" in the house. 2 VRP at 600. The officer explained that entering a house

looking for people with warrants presented safety concerns that outweighed letting Douglas get dressed.

I.      Alvarez's Testimony

The State also called Alvarez as a witness. Alvarez and Douglas were housed together while Douglas was held in jail before trial. Alvarez testified that he and Douglas were in a mixed unit for general population and "sex offenders." 2 VRP at 793. Alvarez testified that Douglas told him about "an agreement . . . where [Douglas] had this friend named Heidi who would bring over this 13-year-old girl for him to have sex with." 2 VRP at 796. Alvarez stated that Douglas said he had photographs on a tablet and on a work computer. Alvarez explained the details of Douglas' professed sexual interactions with the girl: Douglas said he would have her wear things and would "have sex . . . with the girl on Heidi. Or, he would be performing oral on one and the girl would be performing oral on Heidi, and they would basically have a threesome, and they would switch positions." 2 VRP at 797.

When the State asked, "Did he explain anything else about those events?", Alvarez said, Douglas "would give her, like, dope or drugs." *Id.* Defense counsel objected. But before the trial court could rule on the objection, the State continued to question Alvarez: "Give whom?", and Alvarez replied, "[t]he 13-year-old girl." *Id.* The trial court then sustained defense counsel's objection and instructed the jury to disregard Alvarez's testimony about the subject. The trial court also warned the prosecutor: "Let's not move forward with the questioning when there is an objection." 2 VRP at 797-98.

Later, when the State asked Alvarez why he eventually disclosed Douglas' admissions, Alvarez said that Douglas was "obviously sick, so, I mean, he should get help, and he should be

held accountable for what he did." 2 VRP at 799. Defense counsel objected and the trial court sustained the objection, instructing the jury to disregard Alvarez's comment.

The State asked Alvarez if Douglas talked to him "about events in the car lot." 2 VRP at 800. Alvarez replied, "Yeah, he told me that he burned it down." *Id.* Defense counsel objected and the trial court sustained the objection, again instructing the jury to disregard Alvarez's comment.

The State then requested to be heard outside the presence of the jury. The State argued that Alvarez's comment about the car lot fire should be admitted because it went to Douglas' consciousness of guilt. The State claimed that Alvarez would have explained that Douglas said he set fire to the car lot because there was evidence there regarding DH's case. Defense counsel argued that Alvarez's testimony was ER 404(b) evidence of prior crimes or bad acts and needed to be proven by a preponderance of the evidence before being admitted.

Defense counsel moved for a mistrial based on Alvarez's testimony. Defense counsel argued that Alvarez's comment about giving "dope or drugs" to DH, his comments that Douglas was "sick" and needed to be "held accountable for what he did," and his comment about the car lot fire violated orders in limine and were "extremely prejudicial" to Douglas. 2 VRP at 797, 799, 802, 813. The State responded that it did not intend to elicit testimony from Alvarez about Douglas giving DH drugs and reiterated its argument about the car lot fire demonstrating Douglas' consciousness of guilt. The State argued that limiting instructions to the jury would be sufficient to cure any potential prejudice. Defense counsel argued that any testimony about the car lot fire needed to be admitted through proper ER 404(b) procedures—the State would have to show Douglas set the car lot fire by a preponderance of the evidence—and that defense counsel was entitled to notice so they could investigate the event and prepare cross-examination questions or

13

object to the testimony before trial. The trial court acknowledged that based on pretrial discussions and rulings, it understood that neither party was planning on raising evidence or testimony about the car lot fire. Defense counsel contended that a limiting instruction would not be sufficient to combat the prejudice from Alvarez's comments.

The trial court agreed that Alvarez's comment about the car lot fire "border[ed] on 404(b)." 2 VRP at 817. The trial court determined it would strike *all* of Alvarez's testimony and reserve its decision on defense counsel's motion for mistrial. The trial court asked defense counsel when it wanted to instruct the jury to disregard the entirety of Alvarez's testimony, and defense counsel stated that it would prefer to provide the instruction at the conclusion of trial "so [as] not to draw any more attention to it than we already have." 2 VRP at 819. Because the trial court decided to strike Alvarez's testimony, there was no cross-examination. After both sides rested later that day, the trial court denied defense counsel's motion for mistrial.

## IV. VERDICT AND SENTENCING

Before jury deliberations the following day, the trial court orally instructed the jury that it was striking Alvarez's testimony and the jury "may not consider the testimony for any purpose." 3 VRP at 904. The jury also received a written instruction striking Alvarez's testimony. The jury found Douglas guilty on all counts. A different jury also found Douglas guilty on both counts of bail jumping.

The trial court held a sentencing hearing. Defense counsel appeared at sentencing over video conferencing and was not in the same location as Douglas. The trial court did not give Douglas instructions on how to interrupt the sentencing proceedings if he needed to talk with his attorney.

14

The State requested that Douglas be sentenced to the high end of the standard sentencing range for second degree child rape, which was an indeterminate sentence with a minimum of 280 months. Defense counsel requested that the trial court sentence Douglas to 210 months to life, which was the low end of the standard sentencing range for second degree child rape. Defense counsel argued that the trial court should consider Douglas' age and the likelihood that he would not be released before he turned 80 years old.

Before announcing its sentence, the trial court asked Douglas if he had anything to say, and he declined. The trial court sentenced Douglas to 280 months to life with lifetime community custody. The trial court accepted defense counsel's assertion that Douglas was indigent, but it imposed legal financial obligations on Douglas, including a $500 victim assessment fee, a $1,000 fee for possession of depictions of a minor engaged in sexually explicit conduct, and "fees as determined by the Department of Corrections." Clerk's Papers (CP) at 333.[3]

ANALYSIS

I. MOTION FOR MISTRIAL

Douglas argues that the trial court abused its discretion by denying Douglas' motion for mistrial based on Alvarez's improper testimony. Douglas contends that because Alvarez improperly testified that Douglas burned down the car lot, drugged DH, and was "'obviously sick'" and "needed help," nothing but a new trial would have safeguarded Douglas' right to a fair trial. Br. of Appellant at 17. Douglas argues that the trial court's jury instruction to strike Alvarez's entire testimony was inadequate because it was untimely. We disagree.

---

[3] The parties seem to agree that this language in the judgment and sentence imposed community custody supervision fees.

We review a trial court's denial of a motion for mistrial for an abuse of discretion. *State v. Allen*, 159 Wn.2d 1, 10, 147 P.3d 581 (2006). A trial court abuses its discretion when its decision is contrary to law, manifestly unreasonable, or based on untenable grounds. *State v. Sassen Van Elsloo*, 191 Wn.2d 798, 807, 425 P.3d 807 (2018).

A.      Cases Evaluating Motions for Mistrial

We only overturn a trial court's decision to deny a motion for mistrial when there is a substantial likelihood that the prejudice from the trial irregularities affected the verdict. *State v. Gamble*, 168 Wn.2d 161, 177, 225 P.3d 973 (2010). To decide whether a trial irregularity was prejudicial, we consider (1) the seriousness of the irregularity, (2) whether the irregularity involved cumulative evidence, and (3) whether the trial court properly instructed the jury to disregard the irregularity. *Id.* We evaluate these factors with deference to the trial court "because the trial court is in the best position to discern prejudice." *State v. Garcia*, 177 Wn. App. 769, 777, 313 P.3d 422 (2013).

The trial court has significant discretion when curing a trial irregularity due to a witness's improper testimony, and a curative instruction can be sufficient to remove any prejudicial effect. *Gamble*, 168 Wn.2d at 177. The ultimate question is whether, when considering all the evidence, the witness's improper testimony was so prejudicial that the defendant would not receive a fair trial. *Id.*

We generally presume jurors follow the trial court's instructions to disregard improper evidence, unless there is evidence on the record to the contrary. *State v. Kirkman*, 159 Wn.2d 918, 928, 155 P.3d 125 (2007). However, we also acknowledge that "'[s]ome curative instructions are insufficient in removing the prejudicial effect of evidence.'" *State v. Gogo*, 29 Wn. App. 2d 107,

115, 540 P.3d 150 (2023) (alteration in original) (quoting *State v. Christian*, 18 Wn. App. 2d 185, 199, 489 P.3d 657 (2021)). For example, there are certain circumstances where curative instructions cannot remove the prejudicial effect of evidence of other crimes. *Id.*

Douglas relies on *State v. Escalona*, where Division One held that the trial court erred by denying a motion for mistrial when a witness violated a motion in limine by testifying about the defendant's prior conviction for the exact same crime. 49 Wn. App. 251, 256, 742 P.2d 190 (1987). Though the trial court immediately instructed the jury to disregard the witness's comment, Division One held that the reference to Escalona's conviction was so improper as to be inherently prejudicial and the jury "undoubtedly would use it for its most improper purpose, that is, to conclude that Escalona acted on this occasion in conformity with the assaultive character he demonstrated in the past." *Id.*

Douglas also relies on *Gogo* to argue that the trial court's curative instructions regarding Alvarez's testimony were not sufficient. 29 Wn. App. 2d at 109. Gogo was charged with child rape of JH and child molestation of TH. *Id.* at 110-11. Before trial, the trial court severed the count involving TH from the counts involving JH. *Id.* at 111. In the trial involving allegations that JH made, the trial court granted Gogo's pretrial motion to exclude any statement that Gogo sexually assaulted TH. *Id.* During trial, JH's grandmother testified that another witness told her Gogo "'had been fooling around with those kids.'" *Id.* at 112 (emphasis omitted) (quoting record).

Defense counsel did not immediately object to this testimony. *Id.* After five additional questions from the State, defense counsel objected and asked to be heard outside the presence of the jury. *Id.* The trial court allowed the State to finish its direct examination of the grandmother and asked defense counsel if she intended to cross-examine the witness. *Id.* Defense counsel said,

"'I may, but I first have a motion.'" *Id.* (quoting record). The trial court did not hear defense counsel's motion; it instead said the grandmother's "'testimony [was] done'" and asked the State to call its next witness. *Id.* (quoting record). After this witness's testimony, the trial court excused the jury and defense counsel moved for mistrial, explaining that the grandmother's testimony about Gogo "'fooling around with those kids'" violated the pretrial order excluding statements that Gogo sexually assaulted TH. *Id.* at 112-13 (quoting record). The trial court did not rule right away but took the matter under advisement until the parties finished presenting evidence. *Id.* at 113.

The next day, the trial court said it would deny the motion. *Id.* It recognized that the testimony "'was a critical and serious irregularity in violation of the pretrial ruling'" but determined it could be cured by a limiting instruction to the jury. *Id.* (quoting record). The trial court told the parties it would strike the grandmother's entire testimony and have her retestify, but the parties disagreed and instead stipulated to facts that would have been elicited by her testimony. *Id.* At the conclusion of the State's case, two days after the grandmother's testimony, the trial court instructed the jury to strike her testimony from the record "'because in part it was appreciably and unfairly defective and hindered by her inability to clearly hear the Prosecutor's questions.'" *Id.* (quoting record).

On appeal, Division One held that the trial court abused its discretion by denying Gogo's motion for mistrial. *Id.* at 119. The court acknowledged that timing of a limiting instruction is relevant, and the "'potential for prejudice is exacerbated' where a jury is 'allowed to go home and consider' improper testimony overnight without first being instructed to disregard" the improper evidence. *Id.* at 116 (quoting *State v. Davenport*, 100 Wn.2d 757, 764, 675 P.2d 1213 (1984)). In Gogo's case, the trial court waited two days before providing any instruction to the jury to

18

disregard the grandmother's testimony. *Id.* Division One concluded that it was "reasonable to assume that during this multiday delay, the improper testimony would have made such an indelible impression on the jury that no instruction to disregard it could mitigate its prejudicial effect." *Id.*

A limiting instruction is not curative if it "'fail[s] to inform the jury that the . . . comment was improper and not to be considered.'" *Id.* (alterations in original) (quoting *Davenport*, 100 Wn.2d at 764). Division One noted that the trial court never told the jury that the grandmother's testimony that Gogo was "'fooling around with those kids'" was improper. *Id.* at 117 (quoting record). Instead, the trial court instructed the jury that the grandmother's testimony was "'hindered by her inability to clearly hear the Prosecutor's questions.'" *Id.* (quoting record).

Division One also acknowledged that defense counsel "could have—and should have—raised their objection and mistrial motion earlier and more forcefully," but concluded that the trial court's delay in instructing the jury was driven by the trial court's decision to wait several days before formally denying Gogo's motion, not by the actions of defense counsel. *Id.* at 118. Defense counsel moved for mistrial as soon as the jury was excused, which was also delayed because the trial court waited for the lunch break and allowed the State to continue calling witnesses. *Id.*

Division One also distinguished Gogo's case from *Gamble*, 168 Wn.2d at 176. *Id.* at 118-19. In *Gamble*, the jury was immediately instructed to disregard the improper testimony, so the trial court did not err by denying defense counsel's motion for mistrial. 168 Wn.2d at 179. Additionally, in *Gamble* the State presented corroborative evidence of guilt, including eyewitnesses, ballistics analysis, and other physical evidence. *Id.* at 179-80. In contrast, Gogo's case hinged on JH's credibility, which the grandmother's testimony impermissibly bolstered. *Gogo*, 29 Wn. App. 2d at 119.

In sum, both the immediacy of the instruction and the weight of other evidence are significant factors in determining whether a mistrial is required after improper testimony.

B.      Alleged Irregularities in Alvarez's Testimony

Douglas argues that there were three irregularities during Alvarez's testimony that warranted mistrial. First, Douglas argues that Alvarez's testimony that Douglas said he burned down the car lot was inadmissible ER 404(b) evidence of other crimes. Douglas argues that the State should have offered this evidence before trial under the ER 404(b) required procedure. Second, Douglas contends that Alvarez's comments that Douglas was "obviously sick," "should get help," and "should be held accountable for what he did" were likely improper opinion testimony. 2 VRP at 799. Finally, Douglas argues that Alvarez's comment that Douglas said he gave DH "dope or drugs" before sexual encounters was improper, though he does not explain the basis for this claim. 2 VRP at 797. However, this comment was cumulative of other evidence because DH testified to feeling symptoms associated with drugs after consuming food and drinks at Douglas' home, and she disclosed these symptoms to the child forensic interviewer.

Even assuming without deciding that these three pieces of Alvarez's testimony were improper, the trial court's limiting instructions to the jury were sufficient to cure any resulting prejudice. Douglas compares this case to *Gogo* and argues that we should adopt its reasoning and conclude that the trial court's instruction to strike Alvarez's entire testimony was untimely and therefore insufficient. However, this case is distinguishable from *Gogo* in several important ways.

Most importantly, Douglas fails to acknowledge that, unlike in *Gogo*, the trial court here immediately gave limiting instructions after each alleged irregularity ordering the jury to disregard Alvarez's comments. The jury in *Gogo* did not receive any limiting instruction regarding the

20

improper testimony until days later, which potentially allowed jurors to consider this testimony overnight. *Gogo*, 29 Wn. App. 2d at 116. Here, the jurors immediately knew that they could not consider Alvarez's improper testimony. The trial court's later instruction striking the entirety of Alvarez's testimony before deliberations—including sections of his testimony benefitting the State that defense counsel did not object to—was thus an extra precaution in an attempt to address Alvarez's improper comments.

Like in *Gogo*, the trial court here did not immediately rule on Douglas' motion for mistrial and did not provide an instruction striking all of Alvarez's testimony until the day after he testified. But, as noted above, the trial court gave limiting instructions immediately after Alvarez's improper comments. And unlike in *Gogo*, the trial court immediately heard defense counsel's motion for mistrial outside of the presence of the jury. When the trial court decided to strike Alvarez's entire testimony, defense counsel specifically asked the trial court to wait until the end of trial before giving the limiting instruction.

To the extent that Douglas relies on *Escalona*, because the trial court in that case also immediately provided a limiting instruction, the alleged car lot fire here was not similar to the crimes for which Douglas was on trial. So Alvarez's testimony did not present the same risk that the jurors would make improper logical conclusions about conformity. Additionally, unlike in *Escalona*, there was no order in limine explicitly excluding evidence about the car lot fire. Finally, there was significant evidence against Douglas in this case, including his own comments to the police, the photographs of DH on his work computer, DH's testimony, and the consistent testimony from the doctors and child forensic interviewer.

We acknowledge that some improper testimony is so prejudicial that no jury instructions, even prompt ones, could cure the resulting prejudice. But here, we have doubts that all of the testimony that Douglas challenges was actually improper, especially the testimony about Douglas' admissions that he gave drugs to a young victim and set fire to his business to destroy evidence, which describe events that were directly relevant to the charged crimes. Nevertheless, none of the testimony Douglas complains about was so prejudicial that it could not be cured with the court's repeated instructions to ignore it, even if the testimony was improper.

Accordingly, it was reasonable for the trial court to conclude that Douglas was not denied a fair trial, and the trial court did not abuse its discretion by denying Douglas' motion for mistrial.

## II. PROSECUTORIAL MISCONDUCT

Douglas argues that the prosecutor committed misconduct by eliciting inadmissible testimony from Alvarez. Specifically, Douglas asserts that the prosecutor improperly continued to question Alvarez, prompting Alvarez to say Douglas gave drugs to "'the 13-year-old girl,'" without waiting for the trial court to rule on defense counsel's objection. Br. of Appellant at 39. Additionally, Douglas contends that the prosecutor committed misconduct by introducing information about the fire at Douglas' car lot through Alvarez's testimony before the trial court could rule on defense counsel's objection.

The right to a fair trial in a criminal case is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by article I, section 22 of the Washington Constitution. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703, 286 P.3d 673 (2012). A defendant alleging prosecutorial misconduct has the burden of proving that the conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). As we have

addressed above, the limiting instructions provided to the jury were sufficient to cure any prejudice from Alvarez's testimony. Douglas cites two places where the State asked a follow-up question before the trial court ruled on an objection. While the State should not have continued its questioning before the court ruled on the objection, these instances are not sufficient to result in prejudice because the trial court told the jury to disregard the testimony immediately. Moreover, as noted above, we have doubts that all of the complained of testimony was improper. Thus, Douglas has not met his burden to show that reversal is required.

### III. EVIDENCE OF DOUGLAS' PRIOR SEXUAL ENCOUNTERS WITH ADULT WOMEN

Douglas argues that the trial court abused its discretion by admitting evidence of Douglas' prior sexual encounters with consenting adult women over defense counsel's objection. Douglas contended that this evidence was inadmissible character and propensity evidence and did not fall under ER 404(b)'s exception for evidence of a common plan or scheme.

Douglas argues that evidence of Douglas' prior sexual encounters did not show that Douglas devised a plan and repeated it to enact similar crimes: "Douglas'[] prior incidents were not crimes, and involved consenting adult women, not children." Br. of Appellant at 49. Douglas states that evidence Douglas engaged in sexual acts with these consenting adult women after they modeled lingerie was not enough on its own to establish a common scheme or plan to sexually assault DH. Douglas further argues that the trial court failed to articulate Douglas' common scheme or plan as it related to this evidence. Finally, Douglas argues that even if this evidence was admissible, its probative value did not substantially outweigh its prejudicial effect. We disagree.

ER 404(b) prohibits admission of a defendant's prior acts to show the defendant's propensity to commit the charged crime. *State v. Fisher*, 165 Wn.2d 727, 744, 202 P.3d 937 (2009).

Before admitting evidence subject to ER 404(b), the trial court must "(1) find by a preponderance of the evidence the misconduct actually occurred, (2) identify the purpose of admitting the evidence, (3) determine the relevance of the evidence to prove an element of the crime, and (4) weigh the probative value against the prejudicial effect of the evidence." *Id.* at 745. For this final step, ER 404(b) incorporates the ER 403 balancing test, which allows the trial court to exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." ER 403; *see also Fisher*, 165 Wn.2d at 745.

However, both the language of ER 404(b) and our case law recognize evidence of a common scheme or plan as a permissible exception to this evidentiary rule. *See, e.g.*, *State v. DeVincentis*, 150 Wn.2d 11, 17-18, 74 P.3d 119 (2003); *Gresham*, 173 Wn.2d at 421-22. A common scheme or plan exists when "'an individual devises a plan and uses it repeatedly to perpetrate separate but very similar crimes'" or acts. *Gresham*, 173 Wn.2d at 422 (quoting *State v. Lough*, 125 Wn.2d 847, 855, 889 P.2d 487 (1995)). But to admit evidence of this type of plan, the State must establish a sufficiently high level of similarity: The State must show that "'the defendant committed markedly similar acts of misconduct against similar victims under similar circumstances.'" *DeVincentis*, 150 Wn.2d at 19 (internal quotation marks omitted) (quoting *Lough*, 125 Wn.2d at 856). Additionally, the acts must have "'such a *concurrence of common features* that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.'" *Id.* at 19-20 (internal quotation marks omitted) (quoting *Lough,* 125 Wn.2d at 856).

We review a trial court's interpretation of ER 404(b) de novo. *State v. Foxhoven*, 161 Wn.2d 168, 174, 163 P.3d 786 (2007). If the trial court interprets ER 404(b) correctly, we review

the trial court's decision to admit or exclude evidence for an abuse of discretion. *Fisher*, 165 Wn.2d at 745. "In doubtful cases, the evidence should be excluded." *State v. Baker*, 89 Wn. App. 726, 732, 950 P.2d 486 (1997). The "potential for prejudice from admitting prior acts is 'at its highest' in sex offense cases." *State v. Slocum*, 183 Wn. App. 438, 442, 333 P.3d 541 (2014) (internal quotation marks omitted) (quoting *Gresham*, 173 Wn.2d at 433).

In *Slocum*, Division Three held that the trial court erred by admitting some evidence of the defendant's prior sexual assaults of the victim's mother and aunt. 183 Wn. App. at 456. The court explained that this evidence should have been excluded because the victim was "much younger than her mother and aunt when the touching began, and, unlike her mother's and aunt's complaints of isolated incidents of touching, [the victim] alleges molestation that was ongoing, over a period of years." *Id.* at 454. The State argued that evidence of a common scheme or plan existed because the molestation of all three victims always occurred in private, but Division Three noted that the defendant did not have a design for getting the victims physically isolated; he "simply seized opportunities when no one was watching." *Id.* at 455.

However, Division Three also held in *Slocum* that the trial court did not abuse its discretion by admitting incidents where the defendant invited the victim or her mother "to sit with him in his recliner" as evidence of a common scheme or plan. *Id.* The court determined that the defendant "[i]nviting the girls to sit next to him or in his lap would be a way for him to get them close enough to molest, in what would be perceived as grandfatherly behavior, and then to escalate to more sexual contact in a way that the girls might feel uncomfortable challenging," and that the defendant's wife many not have noticed. *Id.* Additionally, in both instances, the defendant was accused of "rubbing the girls' crotch and vaginal areas." *Id.*

In *Gresham*, the Washington Supreme Court held that evidence of the defendant's alleged molestation of other young girls was admissible under ER 404(b) as evidence of a common scheme or plan. 173 Wn.2d at 423. Though there were some differences in the details of the assaults (like the presence of oral sex), ultimately the similarities were sufficient: the defendant took trips with young girls or hosted them in his house, "and at night, while the other adults were asleep, approached those girls and fondled their genitals." *Id.* at 422.

We acknowledge Douglas' argument that there are some differences between Douglas' prior sexual encounters with consenting adult women and his sexual assault of DH. The women were all adults significantly older than DH, they consensually participated in sex acts with Douglas, and there was no evidence that Douglas gave them controlled substances before any sexual encounters.

But the specific similarities of Douglas' sexual encounters with his prior sexual partners and his interactions with DH are extensive. With both his consensual sexual partners and DH, Douglas provided lingerie at his house, he took pictures or videos of the people wearing the lingerie in his bedroom, he eventually engaged in sex acts with them, and he kept the photos on his work computer. Additionally, the fact that Douglas' prior acts all involved consenting adults reduces concerns of prejudice under ER 403 balancing. Jurors were less likely to have an emotional reaction to Douglas' prior sexual encounters precisely because they involved consenting adults. We conclude that it was not an abuse of discretion for the trial court to find a common scheme or plan.

Douglas also argues that the trial court did not provide sufficient findings on the record about its balancing of the probative and prejudicial impact of this evidence. Generally, a trial court

must perform its balancing of the probative and prejudicial value of ER 404(b) evidence on the record. *State v. Acosta*, 123 Wn. App. 424, 433, 98 P.3d 503 (2004). But the "trial court's failure to articulate its balancing process may be harmless if the record as a whole permits appellate review." *Id.* "And where a trial court rules on the admissibility of ER 404(b) evidence immediately after both parties have argued the matter and the court clearly agrees with one side, an appellate court can excuse the trial court's lack of explicit findings." *State v. Stein*, 140 Wn. App. 43, 66, 165 P.3d 16 (2007).

Here, during their ER 404(b) arguments, the parties explained the potential probative and prejudicial impacts of admitting evidence of Douglas' sexual encounters with adult women. Immediately after these arguments, the trial court concluded that it found the evidence more probative than prejudicial. While the trial court likely should have provided more explanation for its conclusion, the record allows us to sufficiently review the trial court's decision. And the trial court did not abuse its discretion when it concluded that the probative value of the testimony regarding Douglas' similar pattern of sexual encounters with consenting adult women was more probative than prejudicial. Thus, we conclude the trial court did not err when it admitted the evidence of Douglas' prior sexual encounters with consenting adult women involving similar facts.

## IV. OTHER EVIDENTIARY DECISIONS

Evidence is only admissible if it is relevant. ER 402. Evidence is relevant if it tends to make any fact pertinent to the outcome of the case more or less probable. ER 401. Generally, the bar to admit relevant evidence is low, as even minimally relevant evidence is admissible. *State v. Darden*, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002). However, under ER 403, relevant evidence

"may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."

We review a trial court's ruling on admissibility of evidence for an abuse of discretion. *Darden*, 145 Wn.2d at 619. For evidentiary decisions that do not implicate a constitutional mandate, error is harmless unless the defendant shows a reasonable probability that the error materially affected the outcome of the trial. *State v. Barry*, 183 Wn.2d 297, 317-18, 352 P.3d 161 (2015).

A.      Photograph of Douglas During Arrest

Douglas argues that the trial court abused its discretion by admitting the photograph of Douglas at the time of his arrest over defense counsel's objection. Douglas contends that the photograph was only minimally relevant because Douglas did not put his identity at issue and did not deny owning the blue bathrobe. Douglas also argues that the photograph was highly prejudicial because it allowed the jury to infer that the police had determined Douglas' guilt from the onset.

In *State v. Rivers*, the Washington Supreme Court held that admission of a booking photo was "not prejudicial because the jury knew the Defendant was arrested for the crime on which he was being tried, and the jury would reasonably have been aware that a booking procedure, including photographing the Defendant, would have existed." 129 Wn.2d 697, 712, 921 P.2d 495 (1996).

The photograph admitted here is probative because Douglas was wearing the same robe that DH said he was wearing when he assaulted her. In the photograph, Douglas was being arrested for bail jumping related to the crimes on which he was being tried. The jury knew that Douglas had been arrested, so the likelihood of prejudice was very low. Though there may have been other

28

means to introduce evidence that Douglas owned a blue robe that he wore without clothes underneath, the trial court did not abuse its discretion by concluding that any prejudice from the photograph did not outweigh its probative value.

B.        Dr. Copeland's Testimony

Douglas argues that the trial court abused its discretion by admitting Dr. Copeland's testimony that she assumed children were "'being truthful'" when they spoke to a physician because this testimony is improper opinion testimony that impermissibly bolstered DH's credibility. Br. of Appellant at 72. Douglas further argues that this error was not harmless because DH's credibility was central to the outcome of the case.

"Experts may not state an opinion about a victim's credibility because such 'testimony invades the province of the jury to weigh the evidence and decide the credibility of witnesses.'" *State v. King*, 131 Wn. App. 789, 797, 130 P.3d 376 (2006) (quoting *State v. Jones*, 71 Wn. App. 798, 812, 863 P.2d 85 (1993)).

In *State v. Kirkman*, the Washington Supreme Court held that admission of a police officer's testimony was not manifest error where counsel failed to object, admittedly a different procedural context. 159 Wn.2d at 931. After explaining that testing for the ability to distinguish between truth and lies was part of standard competency protocol, a police officer testified that the child victim "was able to distinguish between the truth and a lie" and "expressly promised to tell [the officer] the truth." *Id.* at 930. The court held that the police officer was not giving an opinion on the victim's testimony, but rather simply providing an account of interview protocol that gave the jury context about the reasonableness of the victim's responses. *Id.* at 931.

Dr. Copeland's comment occurred in the portion of her testimony discussing her typical interview protocol, not DH's specific testimony. She said that she "assume[s]" the children she interviews are being truthful, which is not the same as opining that a particular child told the truth. 2 VRP at 717. Dr. Copeland further explained that it is her broad practice to take patients' histories "at surface value" because she does not have a reason to do otherwise. 2 VRP at 718. In the context of Dr. Copeland's entire testimony, it is much more likely the jury perceived her comment as simply providing a summary of her standard interview protocol. Like the officer in *Kirkman*, Dr. Copeland did not provide testimony that she personally believed DH was telling the truth. Instead, she explained that in the course of these kinds of interviews with children, her standard protocol is to *assume* their comments are true because they are seeing a physician. Thus, we conclude that the trial court did not abuse its discretion by admitting this testimony.

C.      Testimony About Other People with Warrants in Douglas' House

Douglas argues that the trial court abused its discretion by admitting evidence that other people with outstanding warrants were in Douglas' home at the time of his arrest. Douglas contends that this evidence was irrelevant under ER 402 because it was admitted to explain the officer's conduct and state of mind during Douglas' arrest, which was not at issue in this trial. Douglas further argues that even if it was relevant, the trial court should have excluded this evidence as unfairly prejudicial under ER 403 because it presented a risk that the jury would find Douglas guilty by association.

Though the officer's conduct during Douglas' arrest was not a fact at issue in this case, defense counsel elicited testimony from the officer about the circumstances of Douglas' arrest. Specifically, defense counsel prompted testimony that the officer arrested Douglas while Douglas

30

was wearing nothing but a robe and shoes. Though Douglas now argues that the officer's conduct was irrelevant, defense counsel opened the door to this line of questioning by focusing on the fact that the officers did not give Douglas time to put clothes on. As for ER 403 balancing, the trial court heard defense counsel's arguments about why details of the arrest—including the fact that two people in Douglas' house had warrants—should be excluded. The trial court ultimately concluded that the warrants were relevant to explain the officer's cautious behavior and were not overly prejudicial. Thus, the trial court did not abuse its discretion by allowing the State to ask the officer about the two people in Douglas' house with warrants. And even if this testimony was improper, it was so tangential that it would not have impacted the outcome of the trial.

## V. CUMULATIVE ERROR

Douglas argues that cumulative error denied him a fair trial. Under the cumulative error doctrine, we may reverse a defendant's conviction when the combined effect of errors during trial effectively denied him his right to a fair trial, "even if each error standing alone would be harmless." *State v. Venegas*, 155 Wn. App. 507, 520, 228 P.3d 813 (2010). The doctrine does not require reversal "where the errors are few and have little or no effect on the trial's outcome." *Id.*

Here, some of Alvarez's testimony may have been improper, but the jury was immediately instructed to disregard this evidence and later instructed to ignore his entire testimony. The trial court did not err when admitting the remaining evidence. Thus, we hold that Douglas' cumulative error claim fails.

## VI. RIGHT TO COUNSEL AT SENTENCING

Douglas argues that the trial court violated Douglas' constitutional right to privately confer with his attorney during sentencing. The State concedes that the trial court did not outline a

procedure for Douglas to confidentially contact defense counsel during sentencing. The State also concedes that Douglas' inability to privately contact defense counsel during sentencing was error, but argues that this error was harmless. The State argues that Douglas declined to exercise his right to speak during sentencing and defense counsel requested a sentence at the low end of the standard sentencing range, so the outcome would not have been different if Douglas could have spoken to defense counsel confidentially. Douglas argues that he may have made additional sentencing arguments against the sentence he received if allowed to confer privately with counsel. Douglas does not identify what those arguments would have been.

Under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution, a criminal defendant has the right to assistance of counsel at all critical stages in the prosecution. *State v. Dimas*, 30 Wn. App. 2d 213, 219, 544 P.3d 597 (2024). A "critical stage" is one "where a defendant's rights were lost, defenses were waived, privileges were claimed or waived, or where the outcome of the case was otherwise substantially affected." *State v. Heng*, 2 Wn.3d 384, 394, 539 P.3d 13 (2023).

The constitutional right to counsel "requires defendants to have the ability to confer meaningfully and privately with their attorneys at all critical stages of the proceedings." *Dimas*, 30 Wn. App. 2d at 219. To determine if a defendant's right to assistance of counsel was violated, "reviewing courts should consider the totality of the circumstances, *including* whether the trial court explicitly established a process for such communications, given the variety of different circumstances that may occur." *State v. Bragg*, 28 Wn. App. 2d 497, 507, 536 P.3d 1176 (2023).

Under RAP 2.5(a)(3), a party is allowed to raise a manifest error affecting a constitutional right for the first time on appeal. *See Dimas*, 30 Wn. App. 2d at 221. "To determine the

applicability of RAP 2.5(a)(3), we inquire whether (1) the error is truly of a constitutional magnitude, and (2) the error is manifest." *Id.* An error is manifest if the appellant demonstrates that it had "practical and identifiable consequences at trial." *Id.*

In *Dimas*, we recently clarified the manifest error analysis in this context, stating that "[t]he *appellant* must make a plausible showing that the claimed error had practical and identifiable consequences at trial." 30 Wn. App. 2d at 221 (emphasis added). Division Two concluded that even though Dimas could not privately communicate with his attorney during critical stage hearings, this was not manifest error because Dimas failed to explain how his ability to privately confer with counsel would have changed the outcome. *Id.* at 222-23. For example, Dimas failed to identify specific information he could have given defense counsel that would have bolstered his motion to dismiss for prosecutorial delay. *Id.* at 222. Additionally, the court noted that Dimas had the opportunity to privately confer with counsel prior to many of the challenged hearings, including Dimas' sentencing hearing, which diminished the probability that the outcome of the case would have been different if Dimas could access his attorney *during* the hearings. *Id.* at 222-23.

Because Douglas did not object to defense counsel videoconferencing during sentencing, we review this error for manifest constitutional error on appeal. The parties agree the sentencing hearing was a critical stage of Douglas' trial.

However, Douglas fails to articulate on appeal what kind of arguments he may have made to the trial court in an attempt to mitigate his sentence. Defense counsel requested the low end of the standard sentencing range and explained why the court should consider Douglas' age and the unlikelihood that he would be released on parole before he turned 80 years old. Though Douglas cites the *possibility* that he may have pointed out additional arguments to defense counsel that

could have mitigated his sentence, Douglas does not identify these arguments. Thus, he has not met his burden to show how being able to privately communicate with defense counsel during his sentencing hearing would have changed the outcome of the hearing. Accordingly, Douglas cannot demonstrate that the claimed error was manifest.

Because Douglas did not object to his remote sentencing hearing below and he has not demonstrated that the claimed error was manifest, we decline to consider his unpreserved claim that his right to confer with counsel was violated.

## VII. LEGAL FINANCIAL OBLIGATIONS

Douglas argues that we should strike the $500 victim assessment fee and any potential community custody supervision fees that the trial court imposed because Douglas was indigent. The State concedes this issue.

At the time of Douglas' sentencing, trial courts could impose discretionary community custody supervision fees. Former RCW 9.94A.703(2)(d) (2021). But in 2022, the legislature removed the courts' authority to impose these fees. *See* former RCW 9.94A.703 (2021), *amended by* LAWS OF 2022, ch. 29, § 8(2). Additionally, trial courts may no longer impose the crime victim penalty assessment on indigent defendants. *See* former RCW 7.68.035(4) (2018), *amended by* LAWS OF 2023, ch. 449, § 1(4). Douglas does not argue the other fee tied to images of minors should be stricken.

The trial court accepted that Douglas was indigent during sentencing, and the State concedes this issue. The trial court must strike the $500 victim assessment fee and the community custody condition imposing fees.

## CONCLUSION

We remand for the trial court to strike the $500 victim assessment fee and the community custody supervision fee provision. We otherwise affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
GLASGOW, J.

We concur:

_____
MAXA, P.J.

_____
PRICE, J.